2022 IL App (1st) 181733
No. 1-18-1733

FIRST DIVISION
March 31, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 00956 |
| | ) | |
| PRENTICE F. PHILLIPS, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Walker concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a jury trial, defendant, Prentice Phillips, was found guilty of two counts of first degree murder (both under a felony murder theory) in connection with the July 1988 death of Margaret Blair, four days after defendant allegedly sexually assaulted her. The court imposed an extended-term sentence of 82 years' imprisonment on count I, the murder count predicated on the felony of aggravated criminal sexual assault. On appeal, defendant first contends that the State failed to prove beyond a reasonable doubt that (1) the alleged assault caused Blair's death four days later and (2) there was contact between defendant and Blair constituting

"sexual penetration," an element of the predicate felony of aggravated criminal sexual assault. See Ill. Rev. Stat. 1987, ch. 38, ¶¶ 12-12(f), 12-14. He otherwise seeks a new trial on several independent grounds, including claims that his trial counsel was ineffective in failing to move to exclude the State's expert opinion; the trial court improperly defined "reasonable doubt" during *voir dire*; the prosecution elicited irrelevant and prejudicial testimony; the prosecutor made improper statements in closing argument; and the trial court erred in permitting the State to amend count II of the indictment mid-trial. Finally, he contends that his extended-term sentence reflected an improper double enhancement.

¶ 2        As discussed below, we reject defendant's challenges to the sufficiency of the evidence supporting his murder conviction. However, we reverse his conviction and remand for a new trial on two independent grounds: (1) the trial court erred in defining reasonable doubt as "significant" doubt and (2) the State elicited irrelevant and prejudicial testimony that the statute of limitations for offenses other than murder had expired.

¶ 3                              I. BACKGROUND

¶ 4        Defendant was indicted in December 2013 on three counts of first degree murder, all under the felony murder statute. *Id.* ¶ 9-1(3). Each count alleged that defendant caused Blair's death while committing a forcible felony: count I was based on the predicate felony of aggravated criminal sexual assault, count II was based on the predicate felony of burglary, and count III was premised on the predicate felony of robbery. The State nol-prossed count III before trial, and the case proceeded to the jury solely on counts I and II.

¶ 5        During *voir dire*, the following exchange occurred between the court and prospective juror Pink Xue, in the presence of other prospective jurors:

"Q. Ms. Xue, let's go back a little bit. When I asked you Question No. 3, I said: The State has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case. You indicated you did not understand?

A. Correct.

Q. Do you understand it now?

A. No.

Q. The case—in a criminal case, the standard is that the State has to prove a defendant guilty beyond a reasonable doubt. You're given the law, you listen to the evidence, and then you would deliberate with your fellow jurors. And the law says that only if you become convinced beyond a reasonable doubt that a person is guilty should you find them guilty. If you have a doubt, a significant doubt, then you shouldn't find them guilty. But it's basically the State's burden to find someone guilty. Do you understand that now?

A. Okay."

¶ 6     Another exchange regarding reasonable doubt occurred between the court and prospective juror Gail Galivan:

"Q. Anything else I haven't asked you that we should know that would cause you to be unfair in any way?

A. Well, what's a reasonable doubt? Could that be defined?

Q. Well, I'm not allowed to really say that. It's not that I know it. There is no definition. It's based on your common life experiences, and the jury is to determine what they feel is a reasonable doubt.

A. Their personal opinion.

Q. Based on your own common sense, life experiences, basically. The courts are not allowed to define reasonable doubt.

A. Okay."

¶ 7        Jury trial commenced in December 2017. Vera Nisavic testified that as of July 1988, she lived in a building in the 7200 block of North Sheridan Road. Blair was her downstairs neighbor. Nisavic agreed that Blair was a "small woman" approximately five feet tall. Blair was elderly but lived independently and appeared to be in good health.

¶ 8        Richard Jones testified that he was a Chicago Police officer in 1988. On July 11, 1988, he and his partner, Edward Vanek, went to a basement apartment in response to a call of a sexual assault. Jones noticed the "metal door latch was broken and hanging from the door frame," which appeared to be the result of a "forced entry." Inside the apartment, he saw Blair lying on the kitchen floor, wearing "sleepwear, nightgown, something like that."

¶ 9        Jones approached Blair and noticed "some injuries to her mouth." Blair told him that "someone forced their way into her apartment, kicked the door in and knocked her down and raped her." Blair described the individual as a "young male black." Jones testified that Blair "was in pain, she was lucid, I could understand what she was saying, but she was in

discomfort." Jones noticed a "crumpled paper towel lying on the floor right near [Blair's] legs." Jones called for an ambulance, and Blair was transported to St. Francis Hospital in Evanston.

¶ 10    Jones identified photographs showing the front door to the apartment, as well as photographs of the kitchen and the paper towel on the floor.

¶ 11    On cross-examination, Jones testified that he arrived at the apartment at 3:11 a.m. He stated that he was "notified of a criminal sexual assault" but he did not know who first called police.

¶ 12    John Serafini testified that he was with the Chicago Police Department as of 1988. Shortly after 3:11 a.m. on July 11, 1988, he was assigned to "protect the crime scene" and ensure that no evidence was disturbed. When he arrived, he saw other officers, as well as Blair on the kitchen floor. He recalled the doorway looked like it had been forced open. While Serafini was at the scene, evidence technicians collected the paper towel from the kitchen floor.

¶ 13    Denise Troche testified that she was assigned to the "Cold Case Unit" of the Chicago Police Department. In 2013, she was tasked with reviewing unsolved cases "to potentially send out for possible DNA testing." She noted that the Chicago Police Department began conducting DNA analysis in the 1990s.

¶ 14    Troche reviewed the case file related to Blair and determined that the case was appropriate for DNA testing due to the "presence of semen on a piece of paper towel." She explained that extracts of forensic evidence from cases in the 1980s were frozen and stored in a secure location. Troche located an "extract" of the paper towel for testing. Troche identified People's Exhibit 7A as the extract of the paper towel and 7B as a blood standard collected from Blair. In June 2013, Troche sent those items to a third party, Cellmark Diagnostics (Cellmark), for analysis. In November 2013, she sent a buccal swab from defendant to Cellmark.

¶ 15        The State's expert witness, Dr. Eimad Zakariya, testified that he was a medical examiner with the Cook County Medical Examiner's Office and had performed approximately 1700 autopsies. Without objection, he was found qualified to testify as an expert in the field of forensic pathology.

¶ 16        Dr. Zakariya testified that he had reviewed the case file for Blair, including the autopsy report (People's Exhibit 8) prepared in 1988 by Dr. Barry Lifschultz, who was no longer with the Medical Examiner's Office. Dr. Zakariya referred to the autopsy report during his testimony.

¶ 17        The autopsy report indicated that Blair died on July 15, 1988. Blair was 81 years old, five feet and five inches in height, and weighed 80 pounds. The report described eight external injuries, including two bruises on the right upper lip, a bruise on the upper portion of the right arm, a bruise on the back of the left elbow, abrasions on the back, a bruise on the front of the left knee, and a bruise on the right ankle. The report states that "[s]pecial examination of the vagina reveals no evidence of injury" and that "[s]pecial examination of the anus reveals no evidence of injury."

¶ 18        With respect to the internal examination of Blair's body, Dr. Zakariya testified that the autopsy report indicated a two inch by two inch bruise of the muscles of the right anterior chest wall, as well as a fracture of the left tenth rib. Examination of the heart showed generalized calcific atherosclerosis of the three major coronary vessels, which Dr. Zakariya referred to as "hardening of the arteries." The autopsy report stated that the heart weighed 320 grams, which Dr. Zakariya said was "mildly enlarged" for a woman weighing 80 pounds.

¶ 19    Dr. Zakariya explained that hardening of the arteries means the "heart has to work harder" to provide itself and the rest of the body with oxygen. He agreed that "calcification impedes the amount of oxygen the heart is able to obtain."

¶ 20    Dr. Zakariya testified that an enlarged heart is "[s]usceptible to medical events," including "an abnormal rhythm called an arrythmia." He testified: "There are different kinds of abnormal rhythms, but potentially a heart could just not beat effectively and then stop beating." He thus testified that "the risk of an enlarged heart is not that it's just working harder" but that "it can just suddenly develop arrythmia and potentially stop beating."

¶ 21    Dr. Zakariya agreed that either stress or trauma could lead to arrythmia, explaining:

> "[T]here are many, many effects of stress on the heart that are still being studied and are not extremely well-understood. But *** there are different kind[s] of stress. If someone is in danger, I think we've all heard of fight or flight response. The heart will suddenly beat faster, want to pump more blood to the rest of the body because it knows that the body needs this to do something, to flee a situation, to deal with some kind of a stress.
>
> In a heart that already has some kind of a disease, that places an even greater burden on a heart that's already susceptible.
>
> Other kinds of stress are things that can over time lead the heart to be susceptible to developing an arrythmia."

Dr. Zakariya went on to testify that "people who are chronically under stress whether it's just typical life stressors or something more serious, over time for whatever reason, have been shown to be susceptible to sudden cardiac arrest."

¶ 22 When asked to describe the effect of physical injury on the operation of the heart, Dr. Zakariya testified:

"Physical injury, trauma require the body to address the trauma. The way the body addresses the trauma typically is it tries to send blood to the area because the blood doesn't just carry red blood cells, which have the oxygen that the body needs, but they also carry all kinds of other types of cells and proteins to help heal the injury that's been caused.

So the heart, the heart is the one that propels all of those healing proteins and blood to the site of injury. So the heart typically at an injury, during an injury, after there has been an injury, has to work harder to deal with the injury and help heal the injury."

¶ 23 Dr. Zakariya testified that the rib fracture was Blair's most significant injury. He testified that it would take longer than four days for a rib fracture to heal and that pain from that injury would "typically" persist through the healing process.

¶ 24 Dr. Zakariya testified that the available medical records indicated that Blair was transferred to a nursing home on July 12, 1988, where she remained until she died on July 15, 1988.

¶ 25 Dr. Zakariya testified that the autopsy report listed anatomic diagnoses as "[m]ultiple injuries including bruises, abrasions and rib fracture, generalized atherosclerosis, and arteriolar

nephrosclerosis." Dr. Zakariya explained that arteriolar nephrosclerosis is a condition where the kidneys' blood vessels are narrowed and hardened due to high blood pressure, causing tissue to die and the surface of the kidneys to look "bumpy."

¶ 26    In the autopsy report, Dr. Lifschultz opined that the cause of death was "multiple injuries due to sexual assault."[1] The report also stated that arteriosclerotic cardiovascular disease "contributed to death."

¶ 27    Asked to explain the term "contributory cause of death," Dr. Zakariya testified:

> "A contributory cause of death is not the primary cause of death, this is not what killed her alone ***. It's believed to be something that contributed to the primary cause of death.
>
> So to give an example, that would be saying that this person died of A, but B somehow contributed, may have sped up that death, somehow two of these factors working together are what killed the person with A being more important and B being secondary but contributory."

¶ 28    Asked for his own opinion about the cause of death, Dr. Zakariya testified: "I *** might phrase it a little bit differently than Dr. Lifschultz. I would have possibly called it complications

---

[1]We note that, although Dr. Lifschultz's autopsy report references "injuries due to a sexual assault," the report does not identify the basis for stating there was a sexual assault. Appended to the autopsy report is an untitled sheet, including Blair's personal information, which states under "Medical History": "Subj[ect] was apparently raped at home on 7/11/88 and sustained rib injuries, taken to Nursing Home on 7/12/88." The same sheet says: "Area 6 Handling Rape" and refers to "Sgt. Tontorrelo." There was no trial testimony regarding this document.

of multiple injuries due to a sexual assault. But I agree the cause of death in this case stemmed from the injuries and that her heart disease was contributory."

¶ 29    Dr. Zakariya opined that the manner of death was homicide. Asked for the basis of his opinion that sexual assault contributed to Blair's death, he testified:

"[S]he was a small woman, an older woman. I believe [if] her injuries were in a younger person they would not necessarily have been that significant *** but I think in her case the combination of the physical trauma which I believe she would have still been healing from, the pain she would have still been feeling and the stress of the circumstances of the incident would have put an already susceptible heart in an older woman at risk for an arrythmia or a sudden cardiac event."

¶ 30    After Dr. Zakariya identified photographs from the autopsy, they were admitted into evidence and published to the jury. He testified that one of the photographs showed "bruising into the muscle of the right anterior chest wall."

¶ 31    On cross-examination, Dr. Zakariya acknowledged that the autopsy report indicated no injury to the vagina or anus, and he agreed there was no "evidence of a sexual injury." He acknowledged that the available hospital records consisted of a single sheet (Defense Exhibit 2).[2] He agreed that he would have expected additional medical records to be generated, but that such records were not in his possession. He acknowledged that the hospital records

---

[2]The hospital records, which are in the appellate record, consist of two pages that appear to be from a single, double-sided form.

indicated that Blair was prescribed Lanoxin, which was a drug "for heart failure," but he could not say whether it had been prescribed before or after her admission.

¶ 32    Dr. Zakariya acknowledged that the bruising observed on Blair could have been from resuscitative efforts and that abrasions could have been bedsores that formed during the days that Blair was in a nursing home following discharge from the hospital.

¶ 33    At one point during cross-examination, Dr. Zakariya agreed with defense counsel that it was possible that Blair would have died on July 15, 1988, "irrespective of what occurred on July 11th." Elsewhere on cross-examination, Dr. Zakariya admitted that he "d[idn't] know what [Blair's] last moments were like" but that "typically when people die of sudden cardiac arrest more often it's an arrythmia, meaning that abnormal rhythm ***. It could have been a sudden heart attack, but it more often seems to be it's an arrythmia." Dr. Zakariya agreed he "would be speculating" that Blair suffered arrythmia.

¶ 34    Defense counsel subsequently asked: "Would it be fair to say that it could be appropriate for a forensic pathologist in this case to say that to a reasonable degree of medical and scientific certainty the cause of death is undetermined?" Dr. Zakariya answered "Yes."

¶ 35    Elsewhere during cross-examination, counsel and Dr. Zakariya discussed scientific literature on sudden death from stress, including articles that defense counsel had submitted to Dr. Zakariya. Dr. Zakariya indicated that these articles generally described death occurring relatively soon after a stressful event:

"Typically in cases like this I tend to look for, and this is really not just about stress and death, but actually kind of a name for this is homicide by heart attack. So what these articles are trying to address

is how the behavior of somebody else intentionally inflicting stress on somebody, very severe stress or hurting them *** can cause a heart attack or arrythmia. And I've been trained that typically this is within a short amount of time after a stressful event."

¶ 36     Dr. Zakariya indicated that two articles were relevant to his theory of causation in this case. One of these was entitled "Emotional Stress as a Precipitating Factor in Sudden Deaths Due to Coronary Insufficiency" authored by Malik.[3] Dr. Zakariya testified that Malik's article referred to a study "that talks about the higher risk [for] widowers in for the [sic] six months after their husbands have passed of dying suddenly." Dr. Zakariya also referred to an article by Dominique Lecomte, explaining:

> "In that article Lecomte talks about studies that have been done after
> very traumatic events and the events I believe that he mentions are
> an increase in the number of deaths after an either [*sic*] earthquake,
> after some terrorist attacks in Israel that were studied years ago and
> after blizzards ***. And it turns out that in what are considered sort
> of severely stressful conditions like those *** the rate of people
> dying naturally who are susceptible I think in one instance doubled."

¶ 37     Dr. Zakariya stated that, although he "typically" would not consider a death from "homicide by heart attack" to occur four days after a stressful event, in Blair's case:

> "I believe that in a woman her age, her weight, she was an
> 80-pound woman, who had suffered some kind of an assault with

---

[3]Malik's full name is not apparent from the record.

some kind of an injury with pain that lingered after the injury ***

would have been susceptible to the stress that in my mind would

have still been fresh after four days."

Dr. Zakariya further testified that, although Blair's death did not fit "neatly" into the scientific research, the assault made her susceptible to death:

"I think she was injured. I think there was a deficit in her,

she hadn't recovered completely within the four days because most

people will tell you if somebody is *** injured and they recover and

then die after the recovery, you can't really attribute it to the original

event.

***

She hadn't recovered yet, so it doesn't quite fit into that

category, so she was still kind of recovering. It's not a natural

disaster, it wasn't a hurricane, it wasn't after a terrorist attack.

But if these events happened, I believe they were severe and

I believe she still would have been dealing with psychological,

mental as well as physical stress of all of this within four days."

¶ 38    On redirect examination, Dr. Zakariya agreed that the hospital records indicated that, at the time of her admission, Blair had a left rib fracture, as well as minor hematoma and ecchymosis. He agreed that "stress [and] pain associated with the sexual assault hasten[ed]" Blair's death and that he "consider[ed] the sexual assault to be included in th[e] chain of events that eventually led to her death."

¶ 39        Pamela Fish testified that as of 1988 she was a forensic scientist in the Chicago Police Crime Lab. She testified that vaginal, oral, and rectal swabs collected at Blair's autopsy tested negative for the presence of semen. The crime lab received a paper towel, which tested positive for the presence of semen. An extract of the paper towel was stored in a freezer to preserve it for future testing.

¶ 40        Ariel Welch, a forensic biologist, testified that she worked for Cellmark in 2013, when Cellmark received items from the Chicago Police Department, including a paper towel that tested positive for the presence of seminal fluid.

¶ 41        Kristen Hammonds testified that, as of August 2013, she was a senior forensic DNA analyst at Cellmark. She performed DNA analysis of a paper towel received from the Chicago Police Department and found it to include an "epithelial fraction" with a mixture of DNA from Blair and an unknown male.[4] The paper towel also included a sperm fraction from the same unknown male. Hammonds agreed that the epithelial fraction was "consistent from originating from skin cells and vaginal secretions." Hammonds generated a report that was sent to the Chicago Police Department and Illinois Crime Lab. On November 7, 2013, Cellmark received a buccal swab from defendant. Hammonds performed DNA testing which showed that the "DNA profile obtained from the epithelial fraction of the paper towel [was] a mixture consistent with Margaret Blair and [defendant]" and that "in the absence of an identical twin, the DNA profile

_____

[4]Epithelial means "of or relating to epithelium." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/epithelial (last visited Mar. 23, 2022) [https://perma.cc/L5F9-3ZHW]. The epithelium is "a membranous cellular tissue that covers a free surface or lines a tube or cavity of an animal body and serves especially to enclose and protect the other parts of the body, to produce secretions and excretions, and to function in assimilation." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/epithelium (last visited Mar. 23, 2022) [https://perma.cc/VHA3-YCWV].

obtained from the sperm fraction from the paper towel [was] identified as originating from [defendant]." Hammonds testified that she performed a statistical calculation regarding that DNA profile. She stated that the "estimated occurrence of this genetic profile at 13 genetic loci *** is 1 in 59.21 quadrillion for the black population." She testified this meant that the "probability of seeing this profile again *** would be like looking over eight million earths' population."

¶ 42    On cross-examination, Hammonds acknowledged that the epithelial DNA found on the paper towel could have come from any bodily substance other than sperm:

"Q. And you performed your DNA testing on that and your

epithelial fraction, which we know can be any type of cells that are

not sperm cells; is that correct?

A. That's correct.

Q. But you simply don't know what that biological substance

is on that swab, do you?

A. No.

Q. It could be skin cells from transfer, correct?

A. Mm-hmm.

Q. Or it can be sweat, blood, saliva, things like that?

A. Yes."

Elsewhere, Hammonds agreed with defense counsel that she could not tell whether the DNA from defendant and Blair were deposited at the same time.

¶ 43        Chicago Police Sergeant John Lally testified that in 2013, he was assigned to investigate the cold case related to Blair. In August 2013, he received Cellmark's report and learned that the sperm fraction from the paper towel originated from an unknown male. In September 2013, Lally received a report from the Illinois State Police Crime Lab, from which he "learned that the sperm fraction donor of the unknown male matched the profile of [defendant]." On October 30, 2013, a search warrant was obtained for a buccal swab of defendant, which was gathered from defendant the next day and sent to Cellmark. In November 2013, Lally received information from Cellmark that the sperm fraction from the paper towel "matched the profile collected from [defendant] on the buccal swab." Defendant was taken into custody in December 2013.

¶ 44        The State proceeded to elicit testimony from Lally that the statute of limitations for burglary and aggravated criminal sexual assault had expired by the time of defendant's arrest:

> "[STATE'S ATTORNEY]: On the 12th of December of 2013, was the defendant charged with burglary?
>
> A. No.
>
> Q. And the statute of limitations for that had expired by 2013?
>
> A. That's correct.
>
> Q. And the statute of limitations for aggravated criminal sexual assault had expired in 2013?
>
> A. That's correct.

> Q. Had the statute of limitations for first degree murder
>
> expire[d] in 2013?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Sustained.
>
> [STATE'S ATTORNEY]: Was the defendant charged with
>
> first degree murder on the 12th of December of 2013?
>
> A. He was."

¶ 45     Following Lally's testimony (but before the State had rested), defendant moved for a judgment of acquittal with respect to count II, the felony murder count premised on commission of a "burglary." In response, the State argued that the indictment contained a "scrivener's error" and that count II should have referred to "residential burglary" instead of "burglary." The State thus requested an amendment to count II to specify "residential burglary" as the predicate felony. Over defense counsel's objection, the court permitted the amendment.

¶ 46     The State then called Angela Kaeshamer, a forensic scientist with the Illinois State Police, who testified as an expert in forensic DNA analysis. In 2013, she reviewed files from Cellmark and compared them to a national database. In September 2013, a database association was made between defendant's profile and the male DNA profile identified by Cellmark in the paper towel sample. Based on the database association, Kaeshamer requested a standard from defendant to confirm that his profile matched that identified on the paper towel.

¶ 47     Following Kaeshamer's testimony, the State rested.

¶ 48     Defendant moved for a directed verdict with respect to count II only. The court denied the motion.

¶ 49  The defense called Dr. Shaku Teas, who previously worked as an assistant medical examiner in Cook County and was board certified in forensic pathology. Without objection, Dr. Teas was declared an expert in forensic pathology.

¶ 50  Dr. Teas testified that she examined all available records regarding Blair, including the two pages of hospital records, the single page of nursing home records, as well as the autopsy report and autopsy photographs. She testified that Blair was transferred to the nursing home after she was in the hospital for "about a day." She noted that the hospital records reflected "an alleged sexual assault, and that she had some bruising and some abrasions, but her prognosis was good."[5] She noted that the hospital records did not describe any "life threatening" injuries to Blair. Dr. Teas testified that although Blair died at the nursing home, there were no records of "what her complaint was right before she died" or what her vital signs were at the nursing home.

¶ 51  Asked for her opinion about Blair's cause of death, Dr. Teas testified that she "would have certified this as a natural cause of death, and either call it arteriosclerotic cardiovascular disease or coronary atherosclerosis, which actually just means that *** Margaret Blair died as a result of a heart disease."

¶ 52  Asked about the autopsy report, Dr. Teas testified that Blair had "no life threatening injuries" and there was no evidence of any "sexual injury." Dr. Teas acknowledged that bruises were found on Blair, but she testified they were "not unexpected in an 81-year old" because "older people bruise easily." Dr. Teas testified that this type of bruising sometimes occurs

---

[5]Under "reason for admission," the hospital records state "assault and rape." None of the State's witnesses referenced this portion of the hospital records.

"spontaneously" in older people. Dr. Teas testified that the hemorrhage in the muscles on the right side of the chest could have been caused by a "resuscitative measure" at the nursing home. She stated that an autopsy photograph showed that the hemorrhage was close to the sternum, where cardiac compressions are performed. Dr. Teas also testified that the abrasions on Blair's lips could have resulted from intubation by paramedics. She opined that marks on Blair's back were "pressure marks from her being in bed" or the result of postmortem lividity, meaning "settling of the blood" after death.

¶ 53    Dr. Teas noted that Blair had "heart disease" and was being treated with Lanoxin, a drug given "for improving the function of the heart." She noted that the heart was enlarged and Blair had atherosclerosis, although the autopsy report did not say "how occluded her coronary arteries were." Dr. Teas also noted there was "evidence of changes in the kidney that we see with hypertension," that is, arterial nephrosclerosis. She testified that hypertension as well as coronary atherosclerosis "would enlarge her heart."

¶ 54    Dr. Teas testified that Blair "could have died at the time she died" irrespective of the assault four days earlier, noting that she was 81 years old with "significant cardiac disease." Dr. Teas would have certified the cause of death as "arteriosclerotic cardiovascular disease" or "coronary atherosclerosis." She opined: "[I]t was a natural cause of death. And if I got some other information, at the most, I would say undetermined. I would not call it a homicide."

¶ 55    On cross-examination, Dr. Teas acknowledged that Blair was sexually assaulted:

"Q. *** Now with regard to your findings in this case, you're

aware that Margaret Blair was 81 years old?

A. Yes.

Q. She weighed 80 pounds?

A. Yes.

Q. And that she sustained a rib fracture *** on July 11th, 1988?

A. Yes.

Q. And it was associated with a sexual assault?

A. I'm aware that there was—that she—somebody broke into her house and sexually assaulted her."

¶ 56    Elsewhere on cross-examination, Dr. Teas agreed that stress can affect the heart and that it is "common for stress to be associated with a sexual assault." She also agreed that stress can lead to arrythmia and that "stress can play a role in sudden death of a person with cardiac problems." However, Dr. Teas opined that the physical injuries Blair sustained on July 11, 1988, "had nothing to do with her death." She also did not believe that stress from the assault contributed to Blair's death, and she opined that it was "unreasonable to see how a pathologist connected the sexual assault that occurred four days earlier to [Blair's] death."

¶ 57    Defendant elected to testify. He stated that he was 52 years old. He denied that he ever burglarized anyone's residence or that he committed a sexual assault.

¶ 58    On cross-examination, defendant acknowledged that he was in Blair's apartment and that his DNA was found on Blair's kitchen floor. He denied that the DNA was from his semen but stated he had an "infected hand" that "dripped right there at the kitchen counter."

¶ 59    Defendant testified that he had been staying in a motel across the street from Blair's building. After a night of "partying," he noticed Blair in the early morning. He saw "an elderly

woman stumble out on the sidewalk, miss her step, and I started to just walk by her like everybody else." When he saw her stumble, he "picked her up" and then "assisted her back to her apartment."

¶ 60        Defendant testified:

> "I seen the light was on in the bedroom, and the kitchen backdoor was open, and she said somebody was in there. I went in there. I looked around. I didn't see anybody. The phone jack was pulled out the wall. I knew something had gone on. I plugged the phone jack back into the wall in her bedroom, and looked in the bedroom, nothing—nobody's there. She came in there. *** I tried to fix the door that had been busted. That's where I pinched my hand, shook it over by the—turn around, shook it. I'm right there at the kitchen counter, and that's where my infection leakage hit the floor. And I talked to her a little bit. She was up, moving around She wasn't—didn't seem to be anything wrong with her after that."

¶ 61        Asked how his DNA ended up on the paper towel, defendant testified: "The police put the paper towel on top of the DNA on the floor, and then they turned it into sperm by use of my DNA, I guess ***." Defendant testified that he "didn't have my [penis] out" in Blair's apartment, and that there was "nothing sexual going on" between him and Blair. Defendant stated that there was "no paper towel on the floor" when he was in the apartment and suggested that police tampered with evidence:

"Q. And that towel that was recovered, that didn't just contain your semen. It contained her epithelial cells, right?

A. This is what I'm told.

Q. Well, that's what the witnesses, said, right?

A. Evidently. They must have told her to wipe herself with it.

Q. So the police must have said—excuse my language, but they said, wipe your vagina with this?

A. Evidently. This is what I figure right here—

Q. Tell us.

A. The police said, [w]ipe yourself with this paper towel, and then they put it on top of my DNA on the floor.

Q. And turned it into semen?

A. And *** hocus-pocused it somehow."

¶ 62    Defendant claimed that, after he returned to his motel, he heard sirens and watched police arrive at Blair's building. He stated that he "saw [Blair] come out of her building and walk and get on the ambulance and leave ***." The defense rested after defendant's testimony.

¶ 63    In rebuttal, the State introduced certified copies of defendant's prior conviction for attempted burglary and two prior convictions for theft. The State then rested in rebuttal.

¶ 64    The jury was instructed, *inter alia*, that "[a] person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, he is committing the offense of aggravated criminal sexual assault." The jury was instructed that

"[a] person commits the offense of criminal sexual assault when he commits an act of sexual penetration upon the victim by the use of force or threat of force." The jury was also instructed that "[a] person commits the offense of aggravated criminal sexual assault when he commits criminal sexual assault; and the victim is 60 years of age or older when the act is committed."

¶ 65    During deliberations, the jury submitted the following note and question:

"The instruction states in order for you to find that the acts of the defendant caused the death of Margaret Blair, the State must prove beyond a reasonable doubt that the defendant's acts were a contributing cause of the death and that the death could not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause.

Question relating: Does a preexisting condition such as arteriosclerotic cardiovascular disease count towards being unconnected to event?"

The court responded to the jury with a note stating: "You have all the evidence and the law. Please continue with your deliberations."

¶ 66    The jury returned verdicts finding defendant guilty of both "first degree murder-aggravated criminal sexual assault" (corresponding to count I) and "first degree murder-residential burglary" (corresponding to count II). Thus, the jury found that defendant caused Blair's death in the course of committing acts that otherwise constituted the predicate felonies of aggravated

criminal sexual assault and residential burglary, although he was not charged or convicted of those underlying felonies.[6]

¶ 67        Defendant filed a motion for a new trial, in which he argued, *inter alia*, that the State failed to prove his guilt beyond a reasonable doubt and that the State's line of questioning to Lally regarding the statutes of limitations was improper. The motion was denied.

¶ 68        Defendant's presentence investigative report (PSI) reflected that he was born in 1965 and had numerous convictions between 1987 and 2012, as well as a pending prosecution for attempted aggravated criminal sexual assault.

¶ 69        At defendant's sentencing hearing, the State presented testimony in aggravation. Deborah Hoffman, a former deputy sheriff for the Cook County Sheriff's Department, described a June 2005 incident in which defendant punched her, leading to his conviction for aggravated battery of a correctional officer.

¶ 70        Natalie O'Brien testified about an incident in 2013 when defendant entered her apartment and touched her "butt." Detective Corey Svedson of the Evanston Police Department testified that in August 2013, O'Brien identified defendant in a photo array and stated that he bit her on the buttock.

¶ 71        In aggravation, the State emphasized defendant's criminal record and argued that he caused "serious harm." The State further argued that because Blair was over the age of 60 years, defendant was eligible for an extended-term sentence between 60 and 100 years'

---

[6]We note that the expiration of the statute of limitations for a predicate felony does not preclude a conviction for felony murder. See *People v. Wilson*, 348 Ill. App. 3d 360, 365 (2004) ("[W]e conclude that (1) conviction on the underlying felony is not an element of felony murder, and (2) the statute of limitations applicable to the underlying felony is irrelevant to the charge and conviction of felony murder.").

imprisonment. Defense counsel urged that imposition of an extended-term sentence, based on Blair's age, would be an improper double enhancement, since Blair being over age 60 was an element of the offense of aggravated criminal sexual assault, the predicate felony underlying count I.

¶ 72        The court determined that "the sentencing range here is 20 to 100. The extended term is 60 to 100." After remarking that defendant had a "violent criminal history stretching over a long period of time" and that Blair was an "82-year-old woman," the court imposed a sentence of 82 years on count I, the felony murder count predicated on aggravated criminal sexual assault.[7] The court merged the conviction on count II (felony murder predicated on residential burglary) into count I and did not impose sentence on count II.[8]

¶ 73        Defendant filed a motion to reconsider sentence, in which he urged the court had applied a double enhancement. After that motion was denied, defendant filed a timely notice of appeal.

¶ 74                                II. ANALYSIS

¶ 75        On appeal, defendant raises numerous claims of error. He first claims that the State failed to prove his guilt beyond a reasonable doubt (with respect to either felony murder conviction) because Dr. Zakariya's expert testimony regarding causation was deficient and equivocal. Alternatively, with respect to his count I conviction, defendant argues that the State failed to prove there was "sexual penetration," an element of the predicate felony of aggravated criminal sexual assault. See Ill. Rev. Stat. 1987, ch. 38, ¶¶ 12-12(f), 12-14(a).

---

[7]The record reflects that Blair was 81 years old.

[8]The written sentencing order indicates that sentence was imposed only on count I, and states "IT IS FURTHER ORDERED THAT C001 & C002 MERGED."

¶ 76    Separate from his sufficiency-of-the evidence claims, defendant argues that he is entitled to a new trial because his trial counsel was ineffective in failing to move to exclude Dr. Zakariya's expert opinion. Defendant independently argues that he was denied a fair trial due to the prosecutor's misconduct in eliciting testimony regarding the statutes of limitation for burglary and aggravated criminal sexual assault. He also claims that the State's closing argument misrepresented the evidence and invited the jury to speculate. Defendant separately argues that he was denied a fair trial because the trial court defined "reasonable doubt" during *voir dire*. Defendant additionally asserts that the trial court erred when it allowed the State to amend count II of the indictment during trial, and that his trial counsel was ineffective for failing to seek dismissal of that amended count. Defendant claims that the cumulative effect of these errors denied him a fair trial. Finally, defendant argues that his extended-term sentence was an improper double enhancement. For the following reasons, we reject defendant's challenges to the sufficiency of the evidence. However, we agree that defendant is entitled to reversal of his conviction and a new trial on two independent grounds: (1) the trial court's comment to prospective jurors equating reasonable doubt with a "significant doubt" and (2) the State's elicitation of irrelevant testimony regarding the statute of limitations for uncharged offenses.

¶ 77                              A. Sufficiency of the Evidence Standard

¶ 78    We first address defendant's challenges to the sufficiency of the evidence. The standard of review is well settled. We consider "whether, viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007).

¶ 79 "On review, all reasonable inferences from the evidence are drawn in favor of the State. [Citations.] The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. "[T]he fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. [Citation.] Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. [Citation.]" *Id.* ¶ 72.

¶ 80                    B. Sufficiency of the Evidence Regarding Cause of Death

¶ 81 Defendant primarily contends that there was insufficient evidence for the jury to find beyond a reasonable doubt that defendant's acts on July 11, 1988, caused Blair's death four days later, as necessary to find him guilty of murder.

¶ 82 Under the law at the time of Blair's death in 1988, a person commits felony murder if he kills an individual without lawful justification, and in performing the acts that cause the death, he "is attempting or committing a forcible felony other than second degree murder." Ill. Rev. Stat. 1987, ch. 38, ¶ 9-1(a)(3). Defendant was convicted and sentenced under count I, for which the predicate felony was aggravated criminal sexual assault. See *id.* ¶ 2-8 (defining " '[f]orcible felony' " to include aggravated criminal sexual assault).

¶ 83 " 'In order to prove a defendant guilty of murder (other than by accountability), the prosecution must prove, *inter alia*, that an act of the defendant contributed to the victim's

death. [Citation.] The defendant's act, however, need not be the sole or immediate cause of death; rather, it is sufficient if the defendant's act contributed to cause the death.' " *People v. Nere*, 2018 IL 122566, ¶ 32 (quoting *People v. Brown*, 169 Ill. 2d 132, 152 (1996)). "Causal relationship is a question of fact which should be left to the trier of fact [citation], and we will not disturb this verdict unless this evidence is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to defendant's guilt [citation]." *People v. Brackett*, 117 Ill. 2d 170, 177 (1987).

¶ 84       An " 'intervening cause completely unrelated to the acts of the defendant' " will relieve a defendant of criminal liability. *Nere*, 2018 IL 122566, ¶ 32 (quoting *Brackett*, 117 Ill. 2d at 176). However, " '[t]he converse of this is also true: when criminal acts of the defendant have contributed to a person's death, the defendant may be found guilty of murder. [Citations.] It is not the law in this State that the defendant's acts must be the sole and immediate cause of death.' " *Id.* (quoting *Brackett*, 117 Ill. 2d at 176). Of particular relevance to the instant case, our supreme court has recognized that even "where the victim's existing health condition contributed to the victim's death" there is still sufficient proof of causation "so long as the defendant's acts contribute to the death." *Brackett*, 117 Ill. 2d at 178.

¶ 85       *Brackett* illustrates this principle and bears a number of factual similarities to the instant case. In *Brackett*, our supreme court affirmed a murder conviction where the trial court credited medical testimony to find that defendant's assault and rape of the 85-year-old victim set in motion a chain of events that led to her death five weeks later. In that case, the evidence showed that the attack left the victim hospitalized with a broken arm, broken rib, and numerous bruises. *Id.* at 173. The victim's personal doctor testified that before the attack, the victim was a

" 'feisty' " woman who lived independently. *Id.* However, during her hospitalization, she "became depressed and resisted efforts to feed her, and her condition progressively weakened." *Id.* The doctor "accounted for the poor prognosis by relating the effects of trauma to elderly patients and the depression of elderly patients when they are removed from their homes for any type of hospitalization." *Id.* at 174.

¶ 86    The doctor requested use of a nasal gastric tube to feed the victim, but her nasal passages were too small and "her facial injuries made it too painful to insert." *Id.* Her doctor withdrew the order for the nasal gastric tube because he did not want to cause her pain, and he believed her death was imminent. *Id.* Three days later, the victim died shortly after she was spoon-fed pureed food. *Id.* The autopsy identified the immediate cause of death as asphyxiation from aspiration of food into the trachea. *Id.* at 174-75.

¶ 87    The trial court, which served as the trier fact, "held that the defendant's acts were a contributing cause of [the victim's] death, in that the defendant, through his criminal acts, set in motion a chain of events which culminated in her death." *Id.* at 176.

¶ 88    Before the supreme court, defendant argued that the State did not meet its burden of proof on causation, as the victim's death was caused by asphyxiation, an "intervening event" that was "totally unrelated to the crimes of rape and aggravated battery" committed five weeks earlier. *Id.* at 175-76.

¶ 89    Our supreme court disagreed, finding that the medical testimony on causation was sufficient to sustain the conviction. The court noted: "In cases such as this, where the causal links are not immediately apparent, we frequently look to medical experts to assist the trier of fact in determining whether the defendant's acts constitute a contributing factor to the victim's

death." *Id.* at 177. The court recognized that "the weight of medical experts' opinions is gauged by the reasons given for their conclusions and the factual details they marshall to support them." *Id.* at 178 (citing *People v. Brown*, 57 Ill. App. 3d 528, 532 (1978)).

¶ 90     The *Brackett* court concluded that it was "not prepared to say *** that the medical evidence and opinions presented to the trier of fact were so unsupported that the trier of fact was left to form his decision on causation based upon nothing more than speculation and inference." *Id.* The court noted the testimony that (1) a nasal feeding tube could not be used "because of the beating the victim had received," (2) the victim's broken rib prevented her from being able to breathe deeply or expel food, and (3) "the victim's depressed, weakened, debilitated state was the direct result of the trauma associated with the attack upon her." *Id.*

¶ 91     Our supreme court also noted that "this is precisely the kind of case where the defendant takes his victim as he finds him" and that, despite a decedent's preexisting health condition, there is sufficient proof of causation "so long as the defendant's acts contribute to the death." *Id.* at 178-79 (noting "a person's advanced age is as significant a part of his existing health condition as diabetes or hardening of the arteries"). Our supreme court concluded that the trial court, as trier of fact, was "entitled to find that the defendant *** who battered and raped an 85-year-old woman, set in motion a chain of events which contributed to her death." *Id.* at 179.

¶ 92                    C. Defendant's Attacks on Dr. Zakariya's Testimony Lack Merit

¶ 93     In the instant case, Dr. Zakariya testified to his opinion that Blair's death stemmed from the injuries and stress caused by the July 11 sexual assault and that "her heart disease was contributory." In arguing that the evidence was insufficient to prove that defendant's alleged acts caused Blair's death four days later, defendant asserts a number of attacks on Dr.

Zakariya's testimony. For the following reasons, keeping in mind that we view the evidence in the light most favorable to the prosecution, we find defendant's arguments unavailing.

¶ 94   First, defendant suggests that Dr. Zakariya's testimony regarding causation was too "equivocal" to support the jury's finding of guilt. As support, defendant cites two of Dr. Zakariya's answers during cross-examination. First, defendant emphasizes that Dr. Zakariya answered "yes" when defense counsel asked: "Would it be fair to say that it could be appropriate for a forensic pathologist in this case to say that to a reasonable degree of medical and scientific certainty the cause of death is undetermined?" Defendant also notes that Dr. Zakariya acknowledged it was "possible" that Blair would have died on July 15, 1988, "irrespective of what occurred on July 11, 1988."

¶ 95   A witness's testimony, including any inconsistencies, is to be evaluated by the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) ("The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact."). We reiterate that it is not our role to reweigh testimony in reviewing the sufficiency of the evidence. *Corral*, 2019 IL App (1st) 171501, ¶ 71. The jury apparently credited Dr. Zakariya's expert opinion about causation, which it was entitled to do.

¶ 96   Defendant suggests that, in light of the two aforementioned answers on cross-examination, Dr. Zakariya "effectively conceded that there was a reasonable doubt" as to whether defendant's conduct contributed to Blair's death four days later. We disagree. Keeping in mind that we view the evidence "in the light most favorable to the prosecution" and "all reasonable inferences from the evidence are drawn in favor of the State" (*id.*), the two cited answers did

not necessarily contradict Dr. Zakariya's causation opinion or preclude the jury from accepting that opinion. The jury could simply have interpreted his answers to mean that (1) it was theoretically possible (but not at all likely) that Blair would have died on July 15 regardless of the attack four days earlier and (2) it was possible that another forensic pathologist could reach a different conclusion. We cannot say that the jury must disregard an expert opinion, merely because the expert recognizes the possibility that another expert might draw a different conclusion from the same facts. Moreover, to the extent the two answers on cross-examination were inconsistent with the bulk of Dr. Zakariya's opinion testimony, on redirect examination, the State elicited testimony confirming his causation opinion. Dr. Zakariya reiterated that the sexual assault "hasten[ed]" Blair's death and that the sexual assault was "included in this chain of events that eventually led to her death."

¶ 97      Viewing the testimony as a whole and in the light most favorable to the State, the jury was entitled to find that any inconsistencies were relatively minor and did not detract from the validity of Dr. Zakariya's opinion that the July 11 assault caused Blair's death.

¶ 98      We are also unpersuaded by defendant's argument that there was insufficient evidence of causation because Dr. Zakariya's opinion that stress from the assault caused Blair's death was "speculative" and unsupported by scientific literature. Defendant emphasizes that Dr. Zakariya acknowledged that, typically, a "homicide by heart attack" would not occur "within a four-day period." Defendant also argues that Dr. Zakariya did not identify scientific literature suggesting a causal connection between a stressful event and death under similar circumstances. Defendant points out that the Lecomte study referenced by Dr. Zakariya concerned cases of death occurring within two hours after an event, such as an earthquake or terrorist attack.

Defendant also notes that Dr. Zakariya referenced a study by Malik regarding persons dying within six months after the deaths of their spouses. According to defendant, Dr. Zakariya effectively conceded there was "no scientific study directly supporting his opinion" and he failed to explain "how or why any of the inapposite studies he referenced actually applied" to Blair.

¶ 99    We find these contentions unavailing. We keep in mind that the "weight of medical experts' opinions is gauged by the reasons given for their conclusions and the factual details they marshall to support them." *Brackett*, 117 Ill. 2d at 178. However, defendant cites no precedent suggesting that a medical expert in a homicide case must cite scientific literature discussing cause of death under similar factual circumstances. Although Dr. Zakariya did not cite scientific literature discussing whether trauma from a sexual assault could lead to death four days later, we cannot say his opinions "were so unsupported that the trier of fact was left to form his decisions on causation based upon nothing more than speculation and inference." *Id.*

¶ 100    Dr. Zakariya testified at length about the negative effect of stress on the heart. Further, there was undisputed evidence that Blair had an enlarged heart and atherosclerosis. Although Dr. Zakariya acknowledged that typically forensic pathologists consider "homicide by heart attack" to occur a short amount of time after the stressful event, he explained the reasons for his causation opinion under the particular facts of this case:

> "In my opinion I believe that in a woman her age, her weight, she
>
> was an 80-pound woman, who had suffered some kind of an assault
>
> with some kind of an injury with pain that lingered after the injury

*** would have been susceptible to the stress that in my mind would

have still been fresh after four days."

The jury, as factfinder, was entitled to credit that testimony.

¶ 101    For similar reasons, we reject defendant's remaining attacks on Dr. Zakariya's causation opinion. Specifically, defendant argues that Dr. Zakariya's opinion was flawed, to the extent it was based on his belief that Blair experienced mental stress and physical pain between the July 11 assault and her death four days later. Defendant posits that these were "unsubstantiated assumptions," as Dr. Zakariya did not explain "how he determined that Blair was *actually* experiencing" stress and pain. Defendant notes that Dr. Zakariya is not a psychiatrist and suggests he was "not qualified to diagnose Blair's mental condition." Defendant also argues that the medical documentation in the record (consisting of a total of three pages from the hospital and nursing home) does not show that Blair "was experiencing pain or injury recovery sufficient to cause her heart failure." In this regard, defendant emphasizes that the hospital records listed Blair's prognosis as "good" and that there are no records describing her level of pain. Defendant suggests that it was "speculation" for Dr. Zakariya to testify that Blair experienced mental stress and physical pain related to the July 11 assault, which, in turn, undermined his causation opinion.

¶ 102    We disagree. Although we acknowledge that the medical records were brief, we cannot say that Dr. Zakariya's opinions amounted to speculation. Rather, there were uncontradicted facts in the record from which it could be inferred that Blair suffered stress and pain from the July 11 incident. Blair, an 81-year-old woman who weighed only 80 pounds, was found lying on her kitchen floor. She told the responding police officer, Jones, that someone "kicked the door

in and knocked her down and raped her." She indicated that she was in pain, and Jones observed injuries to her lips. The hospital record reflected she had suffered a broken rib when she was admitted. She was also prescribed a painkiller. Although she was discharged from the hospital the next day, she remained in a nursing home until her death.

¶ 103    In light of this evidence, we reject defendant's suggestion that the jury could not credit Dr. Zakariya's opinion that Blair experienced stress and pain in the days leading up to her death. Indeed, even without an expert opinion, the jury could reasonably infer, as a matter of common experience, that Blair experienced pain and stress from the assault. See *People v. Bishop*, 218 Ill. 2d 232, 250 (2006) (in discussing "bodily harm" element of aggravated criminal sexual assault, recognizing that "[i]n determining whether a defendant's actions caused bodily harm, direct evidence of injury may be considered or the trier of fact may infer injury based upon circumstantial evidence in light of common experience"). The jury was entitled to weigh and draw reasonable inferences from the available evidence and to accept Dr. Zakariya's causation opinion.

¶ 104    We note that, in attacking Dr. Zakariya's testimony, defendant frequently references contradicting trial testimony from the defense expert, Dr. Teas, who agreed that Blair was sexually assaulted but disagreed as to Blair's cause of death. For example, defendant notes Dr. Teas's testimony that Blair could have died on July 15 "irrespective of" the assault on July 11, as well as her testimony that older people "may not even be aware of" rib fractures. However, to the extent the case presented a "battle of the experts" regarding the cause of death, it was the jury's role to resolve conflicts in their testimony. See *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 828 (2008) ("It is normally the role of the jury to

assess the credibility of the medical experts and to determine the value of their testimony. [Citations.] When the experts conflict, the jury is expected to resolve the conflict by evaluating the relative merits of the experts and their opinion, and decide the weight to be given to their testimony. [Citations.]"). As factfinder, the jury apparently found Dr. Teas's expert testimony regarding Blair's cause of death unpersuasive, while crediting Dr. Zakariya's testimony.

¶ 105    In sum, we decline to second-guess the jury's decision to credit Dr. Zakariya's testimony that the assault contributed to Blair's death. As the State pointed out at oral argument, this is an example of "the kind of case where the defendant takes his victim as he finds him." *Brackett*, 117 Ill. 2d at 178. That is, despite Blair's preexisting cardiovascular condition, defendant may be held responsible for murder if there is evidence that "defendant's acts contribute[d]" to her death. *Id.* As in *Brackett*, the factfinder was entitled to find that defendant's assault on Blair "set in motion a chain of events which contributed to her death." *Id.* at 179. We thus reject defendant's primary challenge to the sufficiency of the evidence.

¶ 106            D. Sufficiency of the Evidence of the "Sexual Penetration" Element

¶ 107    In his second sufficiency-of-the-evidence challenge, defendant claims that the State failed to prove that he committed aggravated criminal sexual assault (the predicate felony underlying count I) due to insufficient evidence of the element of "sexual penetration." Under section 12-12(f) of the Criminal Code of 1961, that element is satisfied by proof of "*any contact, however slight*, between the sex organ of one person and the sex organ, mouth or anus of another person." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 38, ¶ 12-12(f). As explained below, the evidence was sufficient for the jury to find such contact.

¶ 108    To prove defendant guilty of felony murder under count I, the State had to prove each element of the underlying predicate felony, aggravated criminal sexual assault. See *People v. Pecina*, 132 Ill. App. 3d 948, 955 (1985) ("To sustain the felony murder conviction, it is fundamental that each element of the predicate offense *** be proved beyond a reasonable doubt."). Under the law applicable to the 1988 incident, a person commits aggravated criminal sexual assault "if she or she commits criminal sexual assault" and any of certain aggravating circumstances were present. Ill. Rev. Stat. 1987, ch. 38, ¶ 12-14(a). One such aggravating factor is that the victim was "60 years of age or over when the offense was committed." *Id.* ¶ 12-14(a)(5). There is no dispute that Blair was 81 years of age. A criminal sexual assault occurs when a person "commits an act of sexual penetration by the use of force or threat of force." *Id.* ¶ 12-13(a)(1).

¶ 109    Significantly, contrary to how the word "penetration" might be commonly understood, the statutory element of "sexual penetration" does *not* require proof that a defendant actually inserted his penis into the victim. Rather, the element of " '[s]exual penetration' " is statutorily defined to mean "*any contact, however slight*, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person." (Emphasis added.) *Id.* ¶ 12-12(f). Further, "[e]vidence of emission of semen is not required to prove sexual penetration." *Id.*

¶ 110    In arguing that the State's evidence did not prove "sexual penetration" beyond a reasonable doubt, defendant points out the testimony that swabs taken from Blair's body did not indicate the presence of semen and that the autopsy report did not indicate injury to her vagina or

rectum. He acknowledges the evidence that the paper towel from the scene contained defendant's sperm as well as an "epithelial fraction" from Blair. However, he emphasizes that Hammonds could not determine whether that epithelial fraction came from Blair's vaginal cells, her skin, or another bodily substance. Defendant further contends that there was no testimony proving the necessary "contact" or an "intrusion" meeting the element of "sexual penetration." See *id.* He acknowledges that Jones testified that Blair said she was "raped." However, defendant argues that "[n]othing showed what Blair, who was born in 1906, meant by the word 'raped.' " That is, he contends that the word "rape" does not prove that there was "sexual penetration" within the meaning of the statute, as opposed to "other objectionable" contact between defendant and Blair.

¶ 111          E. The Evidence Was Sufficient to Prove Contact Constituting "Sexual Penetration"

¶ 112          We reject this sufficiency-of-the evidence challenge. We first note that the autopsy report indicated that Blair's cause of death was "multiple injuries due to a sexual assault" and both experts accepted that Blair was, in fact, sexually assaulted. Even *the defense expert*, Dr. Teas, testified that "somebody broke into her house and sexually assaulted her." Thus, the jury heard from both the State and the defense expert that Blair had been sexually assaulted.

¶ 113          In addition to the experts' testimony, the physical evidence and the testimony that Blair told police she was "raped" allowed the jury to find beyond a reasonable doubt that there was, at least, some "contact, however slight," between defendant's penis and Blair's vagina, mouth, or anus, which was all that was necessary to prove " '[s]exual penetration.' " See *id.*

¶ 114          The physical evidence and related DNA testing was consistent with a sexual assault involving contact constituting "sexual penetration" within the meaning of the statute. Multiple

State witnesses (Fish and Welch) testified that the paper towel recovered from Blair's kitchen floor tested positive for the presence of semen. Further, Hammonds testified that DNA analysis revealed the paper towel contained a "sperm fraction *** identified as originating from [defendant]" as well as an epithelial fraction containing DNA from both Blair and defendant. Hammonds agreed that the epithelial fraction of Blair's DNA was "consistent [with] originating from skin cells and vaginal secretions."

¶ 115    Furthermore, the jury heard testimony that was consistent with a sexual assault. Blair was found on the ground, with the paper towel containing semen near her legs. Importantly, the jury heard that Blair told the responding police officer that she had been knocked down and "raped" by the assailant.

¶ 116    Defendant suggests that Blair's use of the word "rape" did not necessarily indicate sexual contact meeting the statutory definition of sexual penetration, especially since Blair was born in 1906. That is, defendant suggests that Blair could have been referring to some other conduct that did not involve contact constituting the element of sexual penetration.

¶ 117    Defendant ignores the fact that while dictionary definitions from about 60 years ago described "rape" as "the crime of having sexual intercourse with a woman or girl forcibly and without her consent" (Webster's New Twentieth Century Dictionary 1494 (2d ed. 1958)), contemporary dictionaries define "rape" as "*unlawful sexual activity* and usually sexual intercourse carried out forcibly or under threat of injury against a person's will or with a person who is beneath a certain age or incapable of valid consent." (Emphasis added.) See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/rape (last visited Mar. 23, 2022) [https://perma.cc/87DN-XYBV]. This shift in dictionary definitions perfectly

coincides with Illinois's statutory language, which has also evolved to describe criminal sexual contact more particularly. See *People v. Maggette*, 195 Ill. 2d 336, 347 (2001) (recognizing that "the legislature has the power to define 'sexual penetration' more broadly than its common and ordinary meaning" and that the statutory definition of "sexual penetration" in section 12-12(f) of the Criminal Code of 1961 is "broader than what was known under prior law"); see also *People v. McIntosh*, 305 Ill. App. 3d 462, 468 (1999) (recognizing that section 12-12(f) only requires slight contact between sex organs and rejecting defendant's reliance on cases "refer[ring] to earlier statutory provisions that required proof of 'actual penetration' ").

¶ 118     In this case, the statutory definition of " '[s]exual penetration' " in effect in 1988 did not require actual penetration, but only slight contact. Ill. Rev. Stat. 1987, ch. 38, ¶ 12-12(f); see also *People v. Herring*, 324 Ill. App. 3d 458, 463-64 (2001) (explaining that under section 12-12(f), "Even in the absence of proof of actual penetration, proof of even the slightest contact between sex organs is sufficient to prove the element of 'sexual penetration.' [Citations.]"); *McIntosh*, 305 Ill. App. 3d at 468 (regardless of whether there was actual penetration, evidence that defendant's penis touched victim's vagina sufficed to prove sexual penetration under section 12-12(f)); *People v. Bofman*, 283 Ill. App. 3d 546, 552 (1996) ("the sexual penetration necessary to support a conviction of aggravated criminal sexual assault need only be slight contact between the sex organ of one person and the sex organ of another person"); *People v. Hall*, 194 Ill. App. 3d 532, 536 (1990) ("It simply is not necessary to have actual penile penetration in order to establish aggravated criminal sexual assault."). In this case, the statutory definition of " '[s]exual penetration' " in effect in 1988 (Ill. Rev. Stat. 1987, ch. 38, ¶ 12-12(f)), which does *not* require actual penetration, trumps any prior definition of "rape."

¶ 119      We thus emphasize that the State did not have to prove, and the jury did not need to find, that defendant committed a "rape" involving actual penetration in order to find him guilty of the crime of aggravated criminal sexual assault. The jury only needed to find that there was some "contact, however slight," between defendant's penis and Blair's vagina, mouth, or anus. *Id.*[9] Keeping in mind that all reasonable inferences are drawn in favor of the State (*Corral*, 2019 IL App (1st) 171501, ¶ 71), Blair's statement that she was "raped," particularly when viewed in conjunction with the physical evidence, supported that finding.

¶ 120      In sum, the autopsy report indicated (and both the State and defense expert witnesses agreed) that Blair was sexually assaulted. Further, given the physical and testimonial evidence, the jury could find there was at least "slight" contact between defendant's sex organ and her sex organ, satisfying the "sexual penetration" element of aggravated criminal sexual assault, the predicate felony for count I. We cannot say that the evidence regarding that element was "so unreasonable, improbable, or unsatisfactory that it justifie[d] a reasonable doubt." *Wheeler*, 226 Ill. 2d at 115. We thus reject defendant's challenges to the sufficiency of the evidence.

¶ 121      Apart from his sufficiency-of-the evidence claims, defendant raises numerous additional claims of error upon which he seeks reversal and a new trial. As set forth below, we find that two of them are meritorious and independently require reversal.

¶ 122            F. Challenges to the Trial Court's Remarks Regarding Reasonable Doubt

¶ 123      Defendant contends that he was denied a fair trial by the trial court's remarks regarding "reasonable doubt" when it addressed potential jurors Xue and Galivan in the presence of other

---

[9]For this reason, the autopsy report's finding that there was no visible injury to the vagina or anus does not undermine our conclusion that there was sufficient evidence of "sexual penetration," as that term is statutorily defined.

prospective jurors, including some who served on the jury.[10] Defendant claims that both sets of comments violated Illinois precedent prohibiting a court from defining reasonable doubt and improperly suggested that the jurors could convict him based on something less than proof beyond a reasonable doubt. We reach different conclusions with respect to the two sets of challenged comments. First, the court's use of the phrase "significant doubt" was a clear error that affected the fundamental fairness of the trial, constituting second-prong plain error. Alternatively, that remark also amounts to first-prong plain error, given the closeness of the evidence on the issue of causation. However, we do not find any error with respect to the other challenged comments regarding reasonable doubt, in which the court indicated that jurors could use their own life experiences and common sense.

¶ 124    Defendant acknowledges that these claims of error were not preserved, as defense counsel did not object during the relevant portions of *voir dire* or include this issue in his motion for new trial. See *People v. Downs*, 2015 IL 117934, ¶ 13 ("Generally, a defendant forfeits review of any supposed jury instruction error if he does not object to the instruction or offer an alternative at trial and does not raise the issue in a posttrial motion."). Nevertheless, defendant contends that we should review the claims under the plain error doctrine, which "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The plain-error doctrine applies when:

---

[10]The record indicates that, although Xue and Galivan were not selected for the jury, other individuals who ultimately served on the jury were present during the challenged statements.

" '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.* (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 125    "The first step of plain-error review is determining whether any error occurred." *Id.*; *Downs*, 2015 IL 117934, ¶ 15 ("To obtain relief under [the plain-error doctrine], a defendant must first show that a clear or obvious error occurred."). Accordingly, we must first assess whether there was "clear or obvious error" in the challenged statements.

¶ 126    Our supreme court has explained: "This court has long and consistently held that neither the trial court nor counsel should define reasonable doubt for the jury. [Citations.] The rationale behind this rule is that 'reasonable doubt' is self-defining and needs no further definition. [Citations.]" *Downs*, 2015 IL 117934, ¶ 19. Thus, if a jury asks for a definition of reasonable doubt, the trial court should respond that the jury must determine its meaning and that the court cannot define it. See *id.* ¶ 24 (where jury submitted a note during deliberations requesting definition of reasonable doubt, the circuit court was "unquestionably correct" when its response stated: " 'We cannot give you a definition [of reasonable doubt;] it is your duty to define [it].' "); *People v. Peoples*, 2015 IL App (1st) 121717, ¶¶ 85, 88-89 (when jury submitted the question " 'What is reasonable doubt?' " the court did not err in responding that

" '[R]easonable doubt cannot be defined for you. That is for you to determine.' "); *People v. Thomas*, 2014 IL App (2d) 121203, ¶¶ 46-47 (when jury requested the "legal definition" of reasonable doubt, the trial court correctly responded that the definition was for the jurors to determine).

¶ 127    The United States Constitution does not prohibit a definition of reasonable doubt. *Downs*, 2015 IL 117934, ¶ 18 (citing *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)). "Any instruction defining reasonable doubt violates a defendant's due process rights *only if there is a reasonable likelihood that the jurors understood the instruction to allow conviction upon proof less than beyond a reasonable doubt*." (Emphasis added.) *Id.*

¶ 128                    G. The Trial Court's "Significant Doubt" Comment Was Erroneous

¶ 129    We turn to consider whether there was any clear or obvious error in the challenged statements regarding reasonable doubt. First, we assess the court's statements to Xue:

> "The case—in a criminal case, the standard is that the State has
>
> to prove a defendant guilty beyond a reasonable doubt. You're
>
> given the law, you listen to the evidence, and then you would
>
> deliberate with your fellow jurors. And the law says that only if
>
> you become convinced beyond a reasonable doubt that a
>
> person is guilty should you find them guilty. *If you have a*
>
> *doubt, a significant doubt, then you shouldn't find them guilty.*
>
> But it's basically the State's burden to find someone guilty. Do
>
> you understand that now?" (Emphasis added.)

¶ 130     Defendant urges that by referring to reasonable doubt as "a significant doubt," the court "improperly suggested that jurors had to have a higher degree of doubt—a 'significant doubt'—than what is required for acquittal under the reasonable doubt standard."

¶ 131     We agree that the court's use of the term "significant doubt" in attempting to explain the concept of reasonable doubt constituted a clear error. First, our precedent makes clear that the trial court should not even attempt to define reasonable doubt. *Downs*, 2015 IL 117934, ¶ 19. Further, the term "significant" doubt is materially different from "reasonable" doubt. In turn, there is an unacceptable risk that the jurors who heard the remark understood "significant doubt" to mean that a level of doubt greater than a "reasonable doubt" was required to acquit defendant. Thus, the "significant doubt" instruction presented a risk "that the jurors understood the instruction to allow conviction upon proof less than beyond a reasonable doubt." *Id.* ¶ 18.

¶ 132     Although there appears to be no Illinois precedent discussing the specific phrase "significant doubt" in this context, the United States Supreme Court's decision in *Victor*, 511 U.S. 1, provides some guidance. In *Victor*, the court evaluated a jury instruction providing, in part, that: "A reasonable doubt is an *actual and substantial doubt* *** as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." (Emphasis in original and internal quotation marks omitted.) *Id.* at 18. The *Victor* defendant argued that "equating a reasonable doubt with a 'substantial doubt' overstated the degree of doubt necessary for acquittal." *Id.* at 19. The United States Supreme Court reasoned that the trial court's instruction could be "somewhat problematic" to the extent it defined "substantial" to mean either " 'not seeming or imaginary' " or " 'that specified to a large degree.' " *Id.*

(quoting Webster's Third New International Dictionary 2280 (1981)). The court explained that the "latter [definition] could imply a doubt greater than required for acquittal." *Id.* at 20.

¶ 133     Nevertheless, the *Victor* court found that additional language in the instructions mitigated the chance that the "actual and substantial doubt" phrase would be misunderstood to lessen the State's burden of proof. First, the court found that "[a]ny ambiguity" as to the meaning of the word "substantial" was "removed" by the instruction's additional phrase "*as distinguished from* a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." (Emphasis in original and internal quotation marks omitted.) *Id.* Furthermore, the *Victor* Court also noted that the instruction at issue included "an alternative definition of reasonable doubt" as "a doubt that would cause a reasonable person to hesitate to act." *Id.* The court stated: "This is a formulation we have repeatedly approved [citations], and to the extent the word 'substantial' denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a commonsense benchmark for just how substantial such a doubt must be." *Id.* at 20-21. Because of this language, the *Victor* Court "d[id] not think it reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one." *Id.* at 21.

¶ 134     *Victor* indicates that, if reasonable doubt is defined as "substantial" doubt, it is "problematic" if it could be understood to mean that jurors must have a "large degree" of doubt to acquit. (Internal quotation marks omitted.) *Id.* at 19. In *Victor*, the "actual and substantial doubt" language did not require reversal because there was additional language in the instructions that clarified the meaning of that phrase to make it consistent with the concept of reasonable doubt. *Id.* at 20-21. In this case, unlike *Victor*, the trial court did not attempt to

clarify its "significant doubt" comment to reduce the chance that jurors would misunderstand the degree of doubt needed for acquittal.

¶ 135    We believe there is a reasonable likelihood that the trial court's reference to a "significant doubt" conveyed to prospective jurors that a degree of doubt stronger than a "reasonable doubt" was needed to acquit, improperly lessening the burden of proof for the State. In this regard, we note that the definitions of "reasonable" and "significant" are quite different. According to Merriam-Webster, "reasonable" simply means "being in accordance with reason" or "not extreme or excessive." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/reasonable (last visited Mar. 23, 2022) [https://perma.cc/T94B-U3X6]. On the other hand, "significant" is defined to mean "large enough to be noticed" or "have [an] effect" or "important." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/significant (last visited Mar. 23, 2022) [https://perma.cc/LNS9-Z2UD]. "Significant" thus denotes a greater degree than "reasonable."

¶ 136    Accordingly, the prospective jurors who heard the court's "significant doubt" remark could very well have interpreted it to mean that acquittal required a degree of doubt somewhat greater than "reasonable" doubt. We thus agree that the remark raised a "reasonable likelihood" that it would be understood "to allow conviction upon proof less than beyond a reasonable doubt." *Downs*, 2015 IL 117934, ¶ 18. For that reason, we find the "significant doubt" remark was clear and obvious error.

¶ 137          H. The "Significant Doubt" Comment Was Second-Prong Plain Error

¶ 138    Having concluded that the "significant doubt" comment was "clear and obvious" error under the first step of the plain error analysis, "[t]he next step under the plain error doctrine

depends upon the defendant's argument." *People v. Sebby*, 2017 IL 119445, ¶ 50. Where a defendant asserts second-prong plain error, "a reviewing court must decide whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process." *Id.* "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Id.* ¶ 51.

¶ 139        In this case, defendant primarily asserts second-prong plain error, arguing that the court's comment was "structural" error that affected the integrity of the judicial process. If we do not find second-prong plain error, he urges that we should find first-prong plain error.

¶ 140        Given the fundamental importance of proper jury instruction on the State's burden of proof, the trial court's "significant doubt" comment clearly constitutes second-prong plain error. Our supreme court has "equated the second prong of plain-error review with structural error, *** *i.e.*, a systemic error which serves to erode the integrity of the judicial process and undermine the fairness of the defendant's trial." (Internal quotation marks omitted.) *Thompson*, 238 Ill. 2d at 613-14. For this type of error, "[p]rejudice to the defendant is presumed because of the importance of the right involved, *regardless* of the strength of the evidence." (Emphasis in original and internal quotation marks omitted.) *Id.* at 613.

¶ 141        There can be no question that a correct instruction on the State's burden of proof is fundamental to the fairness of any criminal trial. See *Thomas*, 2014 IL App (2d) 121203, ¶ 20 ("The requirement to correctly instruct the jury on fundamentals such as the proper burden of proof is of constitutional dimension."). Our supreme court has recognized that an improper

reasonable doubt instruction is a "structural" error that "serves to erode the integrity of the judicial process and undermine the fairness of a trial." *People v. Washington*, 2012 IL 110283, ¶ 59 ("Errors that the [United States Supreme Court] has found to be structural include the complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, denial of a public trial, and defective reasonable doubt instructions." (citing *Neder v. United States*, 527 U.S. 1, 8-9 (1999))).

¶ 142    In turn, we conclude that the trial court's "significant doubt" comment was a clear and obvious error that " 'affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Thompson*, 238 Ill. 2d at 613 (quoting *Piatkowski*, 225 Ill. 2d at 565). As this was second-prong plain error, defendant is entitled to a new trial on that ground alone.

¶ 143    I. Alternatively, the "Significant Doubt" Comment Constitutes First-Prong Plain Error

¶ 144    Although we agree with defendant that the "significant doubt" comment was second-prong plain error and warrants reversal on that basis, we note our agreement with his alternative contention that the comment constitutes first-prong plain error, independently warranting reversal and a new trial on that ground. That is, we agree that "the evidence was so closely balanced" that the erroneous comment "severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51.

¶ 145        In particular, the trial evidence was "closely balanced" on the crucial question of whether defendant's acts contributed to Blair's death.[11] Even assuming that defendant sexually assaulted Blair, the evidence was close as to whether the assault contributed to her death four days later. In this regard, we emphasize that the medical records of Blair's condition are sparse and lacking in detail. They reflect Blair was discharged from the hospital the day after the assault, with a "good" prognosis. Although Blair died in a nursing home three days later, the evidence contained only a single page of record from the nursing home that does not detail her symptoms or condition in the final days of her life. The jury heard no testimony from any healthcare provider who treated Blair. Further, the autopsy reflected that Blair, an 81-year-old woman who weighed 80 pounds, had preexisting "atherosclerosis of the three major coronary vessels." Although the autopsy report stated that Blair died of "multiple injuries due to a sexual assault" and that "arteriosclerotic cardiovascular disease contributed to death," the jury heard no testimony from the physician who performed the autopsy.

¶ 146        The causation question largely boiled down to a battle of expert witnesses. Dr. Zakariya opined that the trauma and stress of the sexual assault contributed to Blair's death, in combination with her preexisting cardiovascular condition. Dr. Teas acknowledged that Blair was sexually assaulted but opined that Blair's death was caused by heart disease, lacking any connection to the assault. It was up to the jury to assess these conflicting expert opinions.

_____

[11]Although we have previously found that the State's evidence of causation was sufficient for the jury to find defendant guilty of murder beyond a reasonable doubt, that is a separate question from whether the evidence is closely balanced for purposes of plain error analysis. See *Sebby*, 2017 IL 119445, ¶ 60 (in discussing first-prong plain error analysis, "[t]he issue before us *** does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence."); *Piatkowski*, 225 Ill. 2d at 566 ("Whether the evidence is closely balanced is *** a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge.").

Further, the jury's note to the court during deliberations indicated that it wrestled with the causation issue. It asked: "Does a preexisting condition such as arteriosclerotic cardiovascular disease count towards being unconnected to event [*sic*]?"

¶ 147    Given the closeness of the evidence on causation, we find that the court's "significant doubt" comment also constitutes first-prong plain error. That is, the comment was a "clear and obvious error" and the "evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." (Internal quotation marks omitted.) *Thompson*, 238 Ill. 2d at 613. The "significant doubt" comment independently warrants reversal as first-prong plain error.

¶ 148    I. The Court Did Not Err in Referring to Jurors' Common Sense and Life Experiences

¶ 149    Although we find that the trial court's "significant doubt" comment is plain error, we reject defendant's claim of error based on the following exchange with prospective juror Galivan:

"[GALIVAN]: Well, what's a reasonable doubt? Could that be defined?

[THE COURT]: Well, I'm not allowed to really say that. It's not that I know it. There is no definition. It's based on your common life experiences, and the jury is to determine what they feel is a reasonable doubt.

[GALIVAN]: Their personal opinion.

[THE COURT]: Based on your own common sense, life experiences, basically. The Courts are not allowed to define reasonable doubt."

¶ 150    Defendant claims that the court's response "erroneously defined reasonable doubt." We disagree. Rather, consistent with Illinois precedent, the trial court explicitly and correctly stated that it was not allowed to define the term. See *Downs*, 2015 IL 117934, ¶ 24; *Peoples*, 2015 IL App (1st) 121717, ¶¶ 88-89; *Thomas*, 2014 IL App (2d) 121203, ¶¶ 46-47.

¶ 151    Defendant otherwise suggests that the trial court's reference to the jury's "common life experiences" and "common sense" resemble comments disapproved of by the United States Court of Appeals for the Third Circuit in *United States v. Hernandez*, 176 F.3d 719 (3d Cir. 1999). In *Hernandez*, the court's statements to the jury before the presentation of evidence included the following:

> " '*How do you decide what is proof beyond a reasonable doubt?*
>
> There is no specific definition. \*\*\* *It's what you in your own heart*
>
> *and your own soul and your own spirit and your own judgment*
>
> *determine is proof beyond a reasonable doubt.*
>
>      \*\*\* *It's what you feel inside* as you listen to the evidence
>
> \*\*\*.' " (Emphases in original.) *Id.* at 729.

The Third Circuit found the instruction erroneous, as it suggested that jurors could convict "based upon what they believed in their own heart, soul and spirit" or upon their " 'gut feeling.' " *Id.* at 731. The court cautioned against "[a]n instruction which allows a juror to convict because of his or her subjective feelings about the defendant's guilt." *Id.* at 732.

¶ 152    The challenged remarks by the trial court are clearly distinguishable from *Hernandez*. In this case, the trial court's references to common sense and life experiences do not resemble the appeals to the jurors' "heart, soul and spirit" in *Hernandez*. See *id.* at 731. The trial court did

not suggest use of a subjective standard to permit conviction based on a "gut feeling." Rather, the trial court's comments were consistent with the settled principle that jurors may take life experiences into account in assessing the evidence. See *People v. Hobley*, 182 Ill. 2d 404, 465 (1998) ("Jurors are entitled to consider the evidence presented in light of their own 'knowledge and observation in the affairs of life.' " (quoting *People v. Rogers*, 16 Ill. 2d 175, 182 (1959))); Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014) ("You should consider all the evidence in the light of your own observations and experience in life."); see also *People v. Barkas*, 255 Ill. 516, 527 (1912) ("The term 'reasonable doubt' has no other or different meaning in law than it has when used in any of the ordinary transactions or affairs of life.").

¶ 153    We cannot discern how the trial court's references to common sense and life experiences would suggest to prospective jurors that they could convict "upon proof less than beyond a reasonable doubt." *Downs*, 2015 IL 117934, ¶ 18. We thus do not find that the challenged statements to prospective juror Galivan contained "clear or obvious" error, let alone plain error.

¶ 154                    J. The Statute of Limitations Testimony Was Irrelevant

¶ 155    Although a new trial is warranted by the court's "significant doubt" comment, we also find that reversal is appropriate for an independent reason. Specifically, we agree with defendant that the prosecutor improperly elicited prejudicial testimony that, by the time of defendant's arrest, the statute of limitations had expired for the offenses of burglary and aggravated criminal sexual assault. The testimony at issue was elicited from Lally as follows:

"[STATE'S ATTORNEY]: On the 12th of December of 2013, was the defendant charged with burglary?

> A. No.
>
> Q. And the statute of limitations for that had expired by 2013?
>
> A. That's correct.
>
> Q. And the statute of limitations for aggravated criminal sexual assault had expired in 2013?
>
> A. That's correct."

Defendant argues that the statute of limitations testimony was improper because its "only conceivable purpose was to imply to the jury that defendant would escape responsibility" for aggravated criminal sexual assault and burglary unless defendant was convicted of murder. The State responds that such testimony was properly admitted to explain the course of the police investigation and the charges that defendant faced.

¶ 156    Before reviewing the merits of this claim, we briefly discuss forfeiture. Generally, "to preserve an issue for appeal a defendant must make a contemporaneous objection at trial and raise the issue in a written posttrial motion." *People v. Reese*, 2017 IL 120011, ¶ 68. Here, the record shows that defense counsel specifically objected when Lally was asked to state the statute of limitations for burglary and when he was asked whether the statute of limitations for first degree murder had expired. However, defense counsel did not specifically object to the questions at issue, asking whether the statute of limitations for burglary and aggravated criminal sexual assault had expired.[12] However, the State does not argue forfeiture in its brief.

---

[12]In his motion for new trial, defendant suggested that Lally answered these questions before defense counsel could voice an objection.

Thus, the State has forfeited any claim of forfeiture. See *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 29 (the State may forfeit a claim of forfeiture by failing to raise it). Moreover, "forfeiture is a limitation on the parties and not the reviewing court, and we may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent." *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. In the interest of justice, we decline to find forfeiture and proceed to address the merits of this specific claim.

¶ 157    We first agree with defendant that the testimony regarding the expiration of the statute of limitations for the uncharged offenses of aggravated criminal sexual assault and burglary was irrelevant to his felony murder prosecution. Under our Rules of Evidence, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Evidence is relevant 'where the fact or circumstance offered tends to prove or disprove a disputed fact or to render the matter at issue more or less probable.' " *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 46 (quoting *People v. Hall*, 192 Ill. App. 3d 819, 823-24 (1989)). "Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011).

¶ 158    In response to defendant's claim that the statute of limitations testimony was irrelevant, the State argues that it was relevant "to explain the course of the cold case investigation." The State cites case law recognizing that evidence is admissible where it illustrates the course of a police investigation leading to an arrest. See *People v. Gonzalez*, 379 Ill. App. 3d 941, 950 (2008) ("evidence of the course of the investigation into a crime and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case");

*People v. Peoples*, 377 Ill. App. 3d 978, 987 (2007) ("Testimony detailing the course of a police investigation is admissible if it is offered for the limited purpose of explaining why the police conducted their investigation as they did or why they arrested the defendant.").

¶ 159    However, we do not see how the specific testimony at issue—that the limitations periods for aggravated criminal sexual assault and burglary had expired—had any relevance to "the investigation into a crime and the events leading up to an arrest" (*Gonzalez*, 379 Ill. App. 3d at 950) or "why [police] arrested the defendant" (*Peoples*, 377 Ill. App. 3d at 987). The statute of limitations had nothing to do with the steps the police took to investigate the assault on Blair or the police actions leading to defendant's arrest. Rather, the statute of limitations testimony concerned a separate topic—which crimes defendant could be charged with *after* his arrest. The State essentially admits this, as its brief goes on to claim that the testimony was needed to "explain to the jury why defendant had been charged with felony murder predicated on two underlying felonies, but not charged with the underlying felonies themselves." Similarly, during oral argument in this appeal, the State suggested that the jury needed an explanation as to why defendant was not charged with offenses other than murder. However, the State has not articulated why that information was relevant.

¶ 160    Simply put, the basis for the State's Attorney's charging decision is distinct from the police investigation leading to defendant's arrest. The State does not direct us to any authority (and we are aware of none) suggesting that testimony on the statute of limitations is properly admitted to explain a charging decision. Rather, we agree with defendant that this testimony was irrelevant.

¶ 161　　　　　　　　K. The Statute of Limitations Testimony Was Not Harmless Error

¶ 162　　　　Our conclusion that the evidence was irrelevant does not end the analysis, as the erroneous admission of evidence is not necessarily reversible error. See *People v. Collins*, 2020 IL App (1st) 181746, ¶ 44 (recognizing "evidentiary error constitutes reversible error if 'we cannot say that retrial without this evidence would produce the same result' " (quoting *People v. Manning*, 182 Ill. 2d 193, 215 (1998))). Once a reviewing court determines that evidence was improperly admitted, it must address whether the admission "was harmless error beyond a reasonable doubt." *In re Brandon P.*, 2014 IL 116653, ¶ 49.

¶ 163　　　　"[O]n harmless error review, the question is not what the jury could have done, but what 'the jury *would have* done.' " (Emphasis in original.) *Collins*, 2020 IL App (1st) 181746, ¶ 44 (quoting *People v. Parmly*, 117 Ill. 2d 386, 396 (1987)). "The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained at trial." *In re Brandon P.*, 2014 IL 116653, ¶ 50. In other words, we assess whether the erroneously admitted evidence was " 'the weight that tipped the scales against the defendant.' " *Collins*, 2020 IL App (1st) 181746, ¶ 44 (quoting *Parmly*, 117 Ill. 2d at 396).

¶ 164　　　　On the record before us, we find there is an unacceptable risk that the irrelevant testimony regarding the statute of limitations contributed to the jury's decision to convict. We agree with defendant that the testimony was potentially prejudicial, insofar as it signaled to the jury that (1) the State could never prosecute defendant for aggravated criminal sexual assault or burglary and, thus, (2) the only way that defendant could be held accountable for his acts against Blair was to convict him of first degree murder.

¶ 165      Regardless of whether the State simply intended for the testimony to "explain" why defendant was only charged with murder, we cannot ignore its practical effect. The testimony communicated to the jury that defendant could no longer be prosecuted for burglary or aggravated criminal sexual assault in relation to the July 1988 attack on Blair. The jury could then infer that murder was the *only* charge for which he could still be held criminally responsible. This presented a risk that the jury would be tempted to convict defendant of murder to ensure that he would not escape punishment for the assault on Blair, even if it had doubts as to whether the attack caused Blair's death four days later.

¶ 166      Although we previously concluded that the State's other evidence was sufficient to support the murder conviction, that does not mean we must disregard improper evidence as harmless beyond a reasonable doubt. See *id.* ¶ 45 (although officer's testimony was sufficient to sustain a conviction, "[w]e cannot conclude, however, that admitting the hearsay statements in the body camera video constitutes harmless beyond a reasonable doubt").

¶ 167      Here, we cannot say that the State's evidence of guilt was so overwhelming that we can disregard the irrelevant testimony as harmless error. Rather, the evidence was close on the question of causation, leading to an unacceptable risk that the statute of limitations testimony impacted the jury's decision to find defendant guilty of murder.

¶ 168      As discussed in our first-prong plain error analysis regarding the court's "significant doubt" comment, the evidence was closely balanced as to whether defendant's acts contributed to Blair's death. Given the lack of detailed medical records or testimony from a treating provider, the causation issue hinged on the jury's assessment of conflicting expert opinions as to whether the sexual assault contributed to Blair's death. Moreover, the jury's note indicated its difficulty

in deciding whether Blair's preexisting cardiovascular condition was "unconnected" to the assault.

¶ 169    Given the closeness of the evidence of causation, we are mindful of the potential impact of the statute of limitations testimony, which signaled that murder was the only crime for which defendant could be punished. It would be improper for the jury's decision to be impacted by its knowledge that defendant could not be prosecuted for other offenses. In our view, there was a risk that the statute of limitations testimony "tipped the scales against the defendant." (Internal quotation marks omitted.) *Id.* ¶ 44. Thus, it cannot be disregarded as harmless error.

¶ 170    In reaching this conclusion, we note the State's argument that "the prosecutor never argued to the jury that defendant should be convicted of murder because otherwise he would be unpunished" for residential burglary or aggravated criminal sexual assault. However, even if the State did not explicitly argue to the jury that they should convict for that reason, we cannot ignore that the statute of limitations testimony effectively informed the jury that a murder conviction was the only way that defendant could be punished for the attack on Blair.

¶ 171    We also note that the State's brief argues that "the evidence of defendant's guilt was made stronger in this case by defendant's testimony which was absurdly incredible." While we recognize that defendant's account of events seems implausible, his testimony had no bearing on the issue of causation. Even if the jury did not believe any part of defendant's testimony, the medical evidence as to whether the assault contributed to Blair's death was close.

¶ 172    For the foregoing reasons, the State's elicitation of the irrelevant statute of limitations testimony affected the fairness of defendant's trial. As the testimony was not harmless error beyond a reasonable doubt, it independently requires reversal and a new trial.

¶ 173    We note that a retrial does not pose double jeopardy concerns. The federal and Illinois constitutions allow retrial "when a conviction has been overturned because of an error in the trial proceedings," but prohibit retrial "if the evidence introduced at the initial trial was insufficient to sustain the conviction." *People v. Drake*, 2019 IL 123734, ¶ 20. "Retrial is the proper remedy if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction." *Id.* ¶ 21. As discussed in addressing defendant's sufficiency-of-the-evidence challenges, the trial evidence was sufficient to support the murder conviction. Therefore, double jeopardy does not bar a new trial.

¶ 174    As we reverse and remand for new trial on these grounds, we need not address the merits of defendant's remaining claims, including (1) whether his trial counsel was ineffective in failing to seek exclusion of Dr. Zakariya's testimony, (2) whether portions of the prosecutor's closing argument were improper, (3) whether the trial court erred in permitting amendment of count II or whether his trial counsel was ineffective in not seeking dismissal of the amended count, or (4) whether his sentence constituted an impermissible "double enhancement."

¶ 175                                          III. CONCLUSION

¶ 176    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand for a new trial.

¶ 177    Reversed and remanded.

---

**No. 1-18-1733**

---

| | |
|---|---|
| **Cite as:** | *People v. Phillips*, 2022 IL App (1st) 181733 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-00956; the Hon. Michael B. McHale, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |

---