2024 IL App (1st) 220707-U

No. 1-22-0707

Order filed December 26, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 7109 |
| | ) | |
| DAVID MORRIS, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Martin and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to convict defendant of first degree murder and two counts of aggravated battery, and trial counsel rendered effective assistance. The judgment of the trial court is affirmed.

¶ 2    On March 21, 2014, an argument inside an apartment building on the south side of Chicago,

Illinois, erupted into violence when defendant David Morris stabbed three men, killing one of them

and leaving the other two badly injured. The State charged defendant with the first degree murder

of Jaquinton Walker and the attempted murder and aggravated battery of Derrell Dennis and Lavell

Turner. Following a bench trial at which defendant claimed he acted in self-defense, the trial court found defendant guilty and sentenced him to 22 and a half years imprisonment for the murder consecutive to two concurrent terms of four years and nine months on each count of aggravated battery.

¶ 3     Defendant now appeals, arguing that the State did not negate the elements of self-defense beyond a reasonable doubt, or, in the alternative, that trial counsel failed to provide effective assistance.

¶ 4     For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 5                         I. BACKGROUND

¶ 6     Defendant was arrested on March 22, 2014, after he surrendered himself to police. He waived his right to a jury trial and we summarize below the evidence adduced at his bench trial.

¶ 7                         A. The State's Case

¶ 8     On March 21, 2014, Diamond Walker went to 7800 South Bennett in Chicago, Illinois with Lavell, her boyfriend, who was convicted of first degree murder in 1997 and unlawful use of a weapon by a felon in 2012[2], and Shanara Elem, one of her friends. The building located at 7800 South Bennett was a multi-unit apartment building. The ground floor of the building had no apartments, and one had to ascend a flight of stairs to reach the "first" floor of the building.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2]Following a hearing on a pretrial motion, the trial court ruled that Lavell's 2012 conviction for unlawful use of a weapon by a felon could be admitted for impeachment purposes, while his 1997 first degree murder conviction could be admitted for impeachment and as *Lynch* evidence. See *People v. Lynch*, 104 Ill. 2d 194 (1984).

¶ 9 According to Diamond, the purpose of the trip was to retrieve Shanara's two children, a two-year-old boy and a newborn girl, from defendant, their father. When they arrived, Shanara could not gain access to the building and defendant soon walked up to the building from down the street. An argument between defendant and Shanara ensued, during which defendant accused Shanara of being involved romantically with Lavell and told Shanara that he was not letting their children go with her. Defendant and Shanara went inside, leaving Lavell and Diamond outside. Shanara returned alone and upset, stating that defendant was refusing to let her have her children.

¶ 10 During the encounter, Lavell was eventually joined by two other men, Derrell and Jaquinton, although accounts vary how Derrell and Jaquinton became involved. According to Diamond, Lavell left and returned with the two men. Derrell likewise claimed that he was sitting outside drinking with Jaquinton when Lavell approached and asked Derrell to come with him; Jaquinton accompanied them even though Lavell did not ask him to do so. However, Lavell testified that he was standing outside the apartment building at 7800 South Bennett when, by pure coincidence, Derrell and Jaquinton walked by.

¶ 11 The three men went inside with Diamond and Shanara with the goal of helping Shanara retrieve her children. When they reached defendant's apartment, which was on the first floor, defendant was not inside. He was instead on the stairs between the first and second floors. An argument between defendant, several other residents of the building, and Lavell, Derrell, and Jaquinton ensued. According to Diamond, Lavell accused defendant of being willing to hit a woman, but not a man. Lavell admitted that he and defendant exchanged some "foul words." Diamond, Lavell, and Derrell were uniform in their testimony that none of them, including Jaquinton, had a weapon or made any threats to defendant. However, photographs admitted into

evidence showed a folding knife with its blade closed next to Jaquinton's body that was not the knife defendant used. Lavell testified that he believed defendant and Jaquinton had a history because of how Jaquinton was behaving. Lavell encouraged Jaquinton to calm down because defendant's hand never left his sweatshirt pocket during the argument and Lavell was concerned defendant had a weapon.

¶ 12 The argument on the stairs terminated when defendant went inside an apartment on the second floor. According to Diamond and Lavell, Lavell suggested they leave and the group began to descend the stairs, while Derrell testified that the three men stood on the stairs and talked for approximately fifteen seconds.

¶ 13 Accounts of what followed next varied slightly between the State's witnesses. Derrell testified he was at the top of the stairs when defendant "stormed past" him and stabbed Lavell four to six times. When defendant turned his attention to Jaquinton and began stabbing him, Derrell attempted to push defendant down the stairs. In response, defendant stabbed Derrell multiple times. Derrell lost consciousness briefly and when he opened his eyes, he saw Jaquinton lying in a fetal position as defendant came back up the stairs. Defendant stopped and stabbed Jaquinton four or five more times and Derrell lost consciousness again. Derrell ultimately underwent surgery to repair a punctured lung.

¶ 14 Diamond, who was already downstairs on the first floor when the attack began, testified that she saw defendant "getting thrown down the stairs," where he landed on Jaquinton and began making stabbing motions, although she could not see anything in defendant's hands. She did not see what happened to defendant, but she said, "He came crashing down so I don't think he would dive down the stairs." She saw Derrell attempt to pull defendant from Jaquinton, and defendant

began making stabbing motions toward Derrell, though Diamond still did not see a knife. Diamond and Shanara fled back to Lavell's car, at which point Diamond saw defendant exit the building holding a knife that he put into the sleeve of his shirt. She admitted that the first time she spoke to police about the incident, she lied about what happened because Lavell told her to lie—though the trial evidence does not reflect what she told police.

¶ 15   Lavell testified that he was on the stairs when defendant exited the apartment and stabbed him in the back. In an attempt to defend himself, Lavell pushed defendant down the stairs. Lavell went up the stairs and tried to enter the second floor apartment looking for help, but the occupants screamed at him to leave. When Lavell descended the stairs, he saw Jaquinton lying on the ground and Derrell was standing by the door on the ground floor looking "discombobulated." Lavell went to his car and drove himself to the hospital, where he remained for three weeks.

¶ 16   On March 22, 2014, defendant, accompanied by his mother, Helen Morris, surrendered to police and Helen gave police permission to search her car. The trunk of her car contained a wad of brown paper towels inside of which was a folded-up knife that "resembled a gun." Photographic evidence showed that the knife was comprised of a handle in the shape of a pink camouflage handgun with a folding blade, upon which was stenciled ".40 Cal Mean Bitch."

¶ 17   The parties stipulated that an autopsy of Jaquinton revealed six stab wounds. Dr. Eric Eason observed one wound to the right chest which pierced the right lung, one wound to the lower left thigh, and four stab wounds to the torso, which pierced the left lung and left cardiac ventricle. He also observed two incised wounds on the posterior left forearm and the left midaxillary line inferior and lateral to the left nipple. Dr. Eason was of the opinion that Jaquinton died as a result of multiple stab wounds.

¶ 18                                  B. Defendant's Case

¶ 19    Defendant's neighbor, Deangelo Maxey, testified that on March 21, 2014, he had a brief conversation with defendant outside the building on South Bennett. Deangelo then walked to a corner store with his brother, Isaiah, and when they returned defendant was alone in front of the building. As Deangelo and his brother were heading inside the building, Shanara and Diamond arrived with a man he did not know. Defendant and the unknown man argued and then defendant and Shanara went inside the building.

¶ 20    Deangelo entered his own apartment on the second floor and from there he could hear defendant and Shanara arguing until defendant "[put] her out of the apartment." Defendant then went through an enclosed back porch and knocked on Deangelo's back door. Deangelo let defendant in and defendant asked him to call 911. Deangelo told defendant he did not wish to be involved, and led defendant to the front door to show him out.

¶ 21    By that time, there were men in the hallway with Shanara and Diamond, and one of the men taunted defendant and told him to come outside the building so they could fight. Deangelo urged defendant to remain calm because he had called 911. As the arguing continued, Deangelo did not see any weapons and no one threw any punches. However, one of the men in the hallway claimed to have a weapon and threatened defendant. Defendant and Deangelo went back inside Deangelo's apartment to wait for the police. From inside the apartment, Deangelo heard a series of pounding noises followed by the sound of defendant's door flying open downstairs. Defendant rushed out of Deangelo's apartment and Deangelo could see defendant "swinging."

¶ 22    Deangelo remained on the second floor and peered over the banister, where he saw a woman take something out of the pocket of a man on the ground. One man who had been injured tried to force his way into Deangelo's apartment, but Deangelo turned him away.

¶ 23    On cross-examination, Deangelo testified that he only saw defendant "swing" at the first man, and then he saw defendant fall. However, he was confronted with his grand jury testimony where he was asked, "What happened after you saw [defendant] tumble down the stairs?" and he answered, "I saw him swinging at the other victims." He also admitted that, while he claimed to hear defendant's door being kicked, the security video showed the three men who were stabbed as being on the stairs when defendant exited Deangelo's apartment. He further admitted that he would describe defendant as "bum rushing" the men on the stairs.

¶ 24    Defendant also called Shanara, who testified that she lived at 7800 South Bennett with defendant for a year at some point in the past, and that she was in a relationship with defendant for three years before that. On March 21, 2014, Shanara was at 7800 South Bennett braiding someone's hair when she left to give Diamond her house keys. Shanara met up with Diamond and Lavell, who were in Lavell's car, and the three drove around for thirty minutes before Lavell returned her to 7800 South Bennett. When Shanara returned, she went inside and up to defendant's apartment, only to find that defendant was not home. She was upset by the fact that defendant left a two-year-old and a newborn alone without supervision, and upon exiting the building, she saw defendant walking up the street. Defendant approached and asked Shanara where she had been, at which point Lavell began arguing with defendant. Shanara insisted that defendant was not yelling at her and was not angry. However, she was impeached with her grand jury testimony where she

testified that defendant "went berserk" and started accusing her of being sexually involved with Lavell.

¶ 25    Shanara and defendant went inside so she could get their children, and defendant wanted her to return a phone he bought for her. She left to go retrieve the phone from Lavell's car, and as she was exiting the building, Lavell, Jaquinton, and Derrell were going inside. When she returned from the car, the three men were on the stairs and she heard Lavell threatening defendant, telling him, "that anywhere he go, that harm was going to be done to him." The argument between the men went on for approximately fifteen minutes, at which point Shanara and Diamond began kicking at defendant's door. From where she was, she could see people standing on the stairs above her but she could not see defendant. Then, as she was kicking the door, trying to get into defendant's apartment, she heard a loud noise and saw people falling. Shanara left the building and went back to the car. Shanara admitted that defendant texted her that day while she was away to tell her that if she did not pick up their daughter right away, he would take her to the police station and Shanara could collect her there. She also acknowledged that she never saw Lavell, Jaquinton, or Derrell with a weapon, and never heard them threaten defendant with a weapon. She also did not hear any gunshots or see a weapon in defendant's hand.

¶ 26    Defendant testified that on March 21, 2014, he texted Shanara to see if she wanted to make some money by braiding the hair of someone that lived in defendant's building. Shanara arrived at defendant's apartment building around 3:30 p.m., but left soon after, only to return around 6 p.m. after defendant called her. Defendant asked her to pick up their daughter because defendant wanted to go somewhere and did not want to take his daughter with him. When defendant realized Shanara had been out with friends, he became irritated and told her she could leave and their

daughter could stay with him. At some point during the ensuing argument, defendant asked Shanara to return a phone he bought for her. While Shanara went to retrieve the phone from Lavell's car, defendant went to Deangelo's apartment because he had a bad feeling that Shanara was "going to go get some guys" who would try to attack him.

¶ 27    After defendant went upstairs to Deangelo's apartment, Lavell, Derrell, and Jaquinton arrived. Defendant met them on the stairs and began arguing with Lavell, who threatened to beat defendant up. Jaquinton then entered the argument and threatened to shoot defendant while showing defendant a bulge in his pocket. Defendant retreated inside Deangelo's apartment with the intent of using the back patio to return to his own unit. But before he could do so, he heard someone kicking his door, though he could not tell who it was. Defendant panicked, fearful that someone might try to hurt his children, and "rushed" out of the apartment with a knife in his hand with the goal of getting back to his apartment. During his attempt to go downstairs, he also feared for his own safety. Defendant claimed that Lavell threw a punch at him, and he swung back with the knife in his hand. In turn, Lavell threw defendant down the stairs, which caused defendant's hand to "burst." Defendant landed on top of Jaquinton and, remembering that Jaquinton claimed to have a weapon, defendant struggled with him and stabbed him.

¶ 28    Defendant described everything after that as "kind of vague." He recalled Derrell trying to punch him and defendant tried to get away. However, he ultimately concluded that if Derrell got ahold of defendant's knife, he would use it on defendant, so defendant stabbed Derrell in an effort to get away. After defendant reached his door, he realized he could not get inside because he did not have his keys. Defendant thought maybe he left his keys in his car, so he went outside where a crowd gathered and approached him. He claimed that he "was on crutches like weeks prior" to

the incident and that he could not "walk that good," but he decided to run. After running a block, defendant stopped and then surrendered himself the next day.

¶ 29    On cross-examination, defendant admitted to texting Shanara a threat that if she was not going to come pick up their daughter, defendant would take her to the police station and Shanara could pick her up there. Defendant insisted this was merely an attempt to get Shanara's attention. He also asserted for the first time on cross-examination that Lavell rushed at defendant as he was going inside Deangelo's apartment. He also claimed for the first time on cross-examination that he passed out after leaving the apartment and going down the block because he had been shot in the leg. He admitted never seeing Lavell, Derrell, or Jaquinton with a knife or a gun. Defendant also insisted that he wanted the phone Shanara had back because it was $500, and that the phone did not cost $2000 and that he would "never spend $2000 on a phone."

¶ 30    Detective David Cavazos testified in the State's rebuttal case. He maintained that he interviewed Deangelo following the incident and that Deangelo never mentioned seeing anyone take something from Jaquinton's pocket. He also recounted his interview of defendant, during which defendant stated he told Shanara he wanted his phone back because he spent $2000 on it. Defendant also told Cavazos that he told Shanara she could pick up their daughter at the police station because "I'm fixing to leave and I'm not taking her with me." Defendant never told Cavazos that he passed out after the incident.

¶ 31    The record contains video evidence taken from security cameras at 7800 South Bennett. One such video admitted into evidence was taken from a camera placed in the stairwell of the building just outside Deangelo's door. From the camera's vantage point adjacent to Deangelo's apartment, one can see the threshold of Deangelo's apartment, but the angle prevents any line of

sight to the door itself. The camera also permitted sight of the staircases going up and down in the building. Deangelo's apartment had a small landing just outside the door. Based on the video, there were multiple steps heading downward from Deangelo's apartment, followed by another small landing, followed by more stairs, at which point the landing outside Deangelo's apartment blocked any further view of what lay below. In the first seconds of the video, defendant ascended the stairs to Deangelo's apartment and knocked on the door before heading downstairs. Deangelo along with several other men could later be seen peering over the banister at something transpiring below. Defendant then reappeared and entered Deangelo's apartment with some other men. Four men, including defendant, then exited Deangelo's apartment and appeared to be conversing or arguing with someone below, out of sight of the camera. Over the course of the conversation, the argument moved up the stairs until Lavell, Jaquinton, and Derrell became visible on the staircase.

¶ 32    Lavell, Jaquinton, and Derrell continued to advance up the stairs until they reached the landing outside Deangelo's apartment; defendant and the men with him consistently retreated up the stairs until they were just outside Deangelo's apartment. Diamond and Shanara then pushed their way to the front of the group, pointing and appearing to yell at defendant. On two occasions during the advance toward Deangelo's door, Jaquinton lunged forward toward defendant. By the end of the altercation, Jaquinton and Lavell advanced all the way to the threshold of Deangelo's door, and at one point their arms briefly crossed the threshold into the apartment after defendant and some of the men with him disappeared from sight inside the apartment. Lavell, with Jaquinton in front of him, turned away and began descending the stairs, while Derrell remained on the landing outside Deangelo's apartment.

¶ 33 Defendant then suddenly reappeared from Deangelo's apartment, rushed past Derrell, and leaped at Lavell. The footage does not show Lavell throwing the first punch as defendant claimed. Defendant made several jabbing motions with his arm before falling or being pushed down the stairs toward Jaquinton. Defendant and Jaquinton disappeared from view down the stairs, and Derrell could be seen running downstairs after them. A few seconds later, defendant reappeared and could be seen struggling with and making jabbing motions toward Derrell.

¶ 34 On April 11, 2018, the trial court found defendant guilty of first degree murder and two counts of aggravated battery. Defendant subsequently filed a complaint regarding trial counsel with the Attorney Registration and Disciplinary Commission (ARDC) and trial counsel was given leave to withdraw. Defendant represented himself and the proceedings languished for approximately two and a half years until defendant eventually sought the appointment of counsel. The trial court appointed counsel for defendant on November 17, 2020. On July 16, 2021, posttrial counsel filed a motion for new trial which alleged, among other things, that trial counsel provided ineffective assistance by failing to call Lemario Muldrow at trial. The motion claimed that Muldrow would have testified that the victims threatened defendant, that Muldrow "stepped in front of the [victims]" when they tried to come up the stairs, and that he would have corroborated defendant's testimony that defendant did not attack anyone "until the guys kicked in his door."

¶ 35 At a hearing on defendant's posttrial motion on March 2, 2022, the State called trial counsel as a witness. Trial counsel testified that he was aware that a witness named Lemario Muldrow testified to the grand jury. When asked why he did not call Lemario, trial counsel explained that he spoke to Lemario and "was not impressed with him" and "didn't think he was going to be able

to help us in any way." Trial counsel stated that he believed Deangelo was a much better witness, and that his decision not to call Lemario was a strategic one.

¶ 36    The trial court denied defendant's motion for new trial on March 4, 2022, and, on May 3, 2022, it sentenced defendant to 22 and a half years in the Illinois Department of Corrections for first degree murder. It also sentenced him to two concurrent terms of four years and nine months for the aggravated battery counts, with both of those terms to run consecutive to the sentence for first degree murder. This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    Defendant raises two primary arguments. The first is that the State failed to prove beyond a reasonable doubt that defendant's actions were not taken in self-defense and that his use of force was not legally justified. Alternatively, defendant asks us to reduce defendant's conviction to second degree murder or involuntary manslaughter.

¶ 39    Secondarily, defendant asks us to grant him a new trial based on the alleged ineffectiveness of trial counsel. We address these issues in turn.

¶ 40                          A. Sufficiency of the Evidence

¶ 41    Our notions of fundamental fairness and due process require that a person may not be convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When we are asked to review the sufficiency of the evidence, we must ask "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 278 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). Put differently, the question is "whether, after viewing the evidence in

the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Cunningham*, 212 Ill. 2d at 278 (quoting *Jackson*, 443 U.S. at 319). We must allow all reasonable inferences from the record in favor of the prosecution, but this does not mean that we may allow unreasonable inferences. *Cunningham*, 212 Ill. 2d at 280. Thus, if only one conclusion may be reasonably drawn from the record, we must draw it even if it favors the defendant. *Id*. Ultimately, however, "the weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 243 (2006). In reviewing the sufficiency of the evidence, it is not our role to reweigh the evidence. *People v. Phillips*, 2022 IL App (1st) 181733, ¶ 95. Indeed, we may not substitute our judgment for that of the factfinder on issues involving credibility and weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). A conviction may only be reversed when the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id*. at 281.

¶ 42    Our statute that authorizes the use of force in defense of a person states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to

himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2014).

¶ 43    Once a defendant raises the affirmative defense of self-defense, the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). The elements of self-defense for which a defendant must present some evidence are that: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable. *Lee*, 213 Ill. 2d at 225; 720 ILCS 5/7-1 (West 2014). If the State can negate even one of these elements, a defendant's claim of self-defense fails. *Lee*, 213 Ill. 2d at 225.

¶ 44    In the context of justified use of force, defendant analogizes this case to *People v. White*, which is inapposite. In *White*, the defendant's gun accidentally discharged in a tavern, and fragments of shattered tile injured the decedent's leg. *People v. White*, 87 Ill. App. 3d 321, 322 (1972). The decedent appeared at the defendant's apartment later that evening, brandishing a knife and making threats. *Id*. The defendant warned the decedent to leave before shooting and killing him. *Id*. The defendant was convicted of manslaughter, but we reversed, reasoning in the process that, when one is required to defend himself, the law recognizes that swift decisions must be made as to whether and how to defend oneself and that it would be unreasonable to require defendants to exercise perfect judgment under stressful circumstances. *Id*. at 322-23.

¶ 45 For this case to be anything like *White*, the decedent there would have had to abandon his quarrel and be shot in the back as he tried to leave. The video in this case was silent, but it still revealed a wealth of information. Defendant can at least be credited with the fact that the argument that ensued on the stairs was a tense moment. To say this was nothing more, as the State argues, than "a verbal argument" where "words were exchanged" does not do the video justice. Lavell, Derrell, and Jaquinton slowly advanced up the stairs over the course of the argument, while defendant, Deangelo, and the other men with them consistently retreated backwards up the stairs until they reached Deangelo's apartment. Jaquinton lunged forward aggressively at defendant twice during the course of the argument, which was visibly volatile—there appeared to be shouting and screaming. At one point during the incident, both Lavell and Jaquinton are standing so close to Deangelo's apartment that their arms cross the threshold as they are pointing. If defendant feared for his safety in that moment, one could hardly blame him. Whether or not threats were made to him, he had been cornered in his own apartment building by people who did not live there and who were shouting, gesticulating wildly at him, and otherwise behaving aggressively.

¶ 46 But then defendant went inside Deangelo's apartment. Lavell and Jaquinton can be seen on the video walking away down the stairs, consistent with testimony that Lavell told everyone they should leave. If Deangelo was to be believed, the police had been called, and the encounter was over—until defendant re-emerged and began savagely attacking Lavell, whereupon the violence spiraled out of control. It is well-established that the right of self-defense does not extend to killing or attacking an original aggressor after the aggressor abandons the quarrel or as an act of retaliation or revenge. *People v. De Oca*, 238 Ill. App. 3d 362, 368 (1992). Thus, even if Lavell, Derrell, and Jaquinton are viewed as the initial aggressors, they abandoned the quarrel and were

attempting to leave when defendant attacked them with a knife. Not only was defendant not defending himself, but he emerged from the apartment and rushed at Lavell so quickly that Derrell, who was standing on the landing holding a drink, did not even react as defendant zoomed past him. Defendant's re-emergence from the apartment was clearly not expected. People who fear for their lives and who are safely secured inside an apartment generally do not leave the safety of that apartment and charge into a violent altercation where they are outnumbered three to one. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that defendant was the aggressor and was not defending himself when he stabbed the three victims.

¶ 47     Then there was defendant's testimony that he was also concerned about the safety of his children and that he was only trying to get to them and protect them. Defendant testified that he heard pounding on his door and that he was afraid Lavell, Jaquinton, and Derrell were trying to break into his apartment to harm his children, which prompted him to leave Deangelo's apartment. Viewing the evidence in the light most favorable to the State, the evidence negated any claim that defendant was attempting to act in defense of others beyond a reasonable doubt. First, the evidence revealed defendant's concern for his children as a shockingly flimsy pretense. Not only did defendant leave his two-year-old son and newborn daughter alone, unsupervised, in his apartment while he ventured down the street, but after the stabbing, defendant fled the building, claiming his front door was locked and he did not have his keys—meaning that his two-year-old and newborn continued to remain unsupervised. More disturbingly, he threatened to leave his newborn daughter at the police station if Shanara did not come retrieve her. Indeed, if defendant was so singularly concerned with getting back to his children, he could have re-entered his apartment through the

back door—the same way he claimed he originally reached Deangelo's apartment. Furthermore, defendant's concern that the three men were trying to break into his apartment to harm his children would have been instantly dispelled upon leaving Deangelo's apartment because all three men were visible on the stairs. Nor were there any allegations that anyone threatened to harm his children—the children that the victims were trying to help Shanara retrieve. Defendant's cynical attempt to use his children as justification for murder is one we reject wholeheartedly, and one which the evidence convincingly negates.

¶ 48    Moreover, defendant's testimony that he had recently been using crutches and therefore could not run well only further disintegrated his credibility and gave the trial court more reasons to credit the testimony of the State's witnesses. If defendant had some sort of leg injury, it did not hinder his ability to leap at his victims and begin stabbing them ferociously. Indeed, defendant made the incredible claim during his cross-examination that he was shot during the encounter even though no other witnesses, even his own, corroborated that a gun was fired. The video taken from the building's entryway camera shows defendant walking in and out multiple times after the stabbings and he appears entirely unencumbered by injuries.

¶ 49    The trial court determined that there was "no justification for what [defendant] did, none whatsoever." The trial court clearly found that the evidence negated at least some elements of defendant's self-defense claim and we cannot find issue with the trial court's finding of guilt. Viewing the evidence in the light most favorable to the State, the evidence proved beyond a reasonable doubt both the charged offenses and that defendant was not justified in acting in self-defense. At a minimum, any rational trier of fact could have found beyond a reasonable doubt that there was no danger of imminent harm to defendant once the encounter terminated, that defendant

was the aggressor, that defendant did not actually believe a danger of harm existed, and that defendant's beliefs were not objectively reasonable. *Lee*, 213 Ill. 2d at 225; 720 ILCS 5/7-1 (West 2014). But as we have noted, negation of one element of self-defense is enough. *Lee*, 213 Ill. 2d at 225.

¶ 50   Accordingly, the evidence was sufficient to convict defendant of first degree murder.

¶ 51   However, defendant argues that, even if the State proved all the requisite elements of murder, we should reduce defendant's conviction to second degree murder. To be convicted of second degree murder, after the State has proved beyond a reasonable doubt the elements of first degree murder, a defendant bears the burden of proving by a preponderance of the evidence that a mitigating factor existed. *People v. Brown*, 218 Ill. App. 3d 890, 896 (1991). These mitigating factors are: (1) whether at the time of the killing, the defendant acted under a sudden and intense passion resulting from serious provocation by the individual killed or (2) whether at the time of the killing, the defendant believes the circumstances to be such that, if they existed, would justify the killing but the defendant's belief was unreasonable. 720 ILCS 5/9-2(a) (West 2014); *People v. Hawkins*, 296 Ill. App. 3d 830, 836 (1998). Whether a mitigating factor was proven is a question of fact, and we will not reverse the trial court's findings if, after viewing the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found the absence of the mitigating factor. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 144.

¶ 52   Defendant insists that he met his burden to show that he truly believed self-defense was necessary to protect himself and his children, but that his belief was unreasonable. We disagree. Nothing about this case aside from defendant's own claims that he was fearful support a conclusion that he truly believed the use of force was necessary to protect himself or his children. As we have

discussed above, defendant's concern for his children up until that point was negligible at best. The notion that he was suddenly willing to kill to protect them in the context of all the circumstances is simply unbelievable, especially when Lavell, Jaquinton, and Derrell were not attempting to break into defendant's apartment and no threats were made against his children.

¶ 53 Likewise, we cannot accept that defendant had a genuine but unreasonable belief that self-defense was necessary to protect himself. The encounter was over and the victims were retreating. There was nothing to defend himself from at that point. From the safety of Deangelo's apartment, defendant exited the apartment, charged at the three men, and began stabbing at them wildly. This was not indicative of a genuine belief that he feared for his safety.

¶ 54 Any rational trier of fact could have found the absence of this mitigating factor, and accordingly, there is no basis to reduce defendant's first degree murder conviction to second degree murder.

¶ 55 Defendant also argues that we should reduce his first degree murder conviction to involuntary manslaughter. One commits involuntary manslaughter when he kills an individual if his actions are likely to cause death or great bodily harm to some individual, and he performs them recklessly. 720 ILCS 5/9-3(a) (West 2014). Our legislature has established a definition for recklessness:

> A person is reckless or acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. 720 ILCS 5/4-6 (West 2014).

¶ 56 Defendant insists that his conduct was simply the result of his panic and his attempts to get to his children, and therefore more indicative of a mental state less than that required for first degree murder. We need not repeat all the circumstances of the offense that we have already discussed, but suffice it to say we disagree. Jaquinton was stabbed six times—to accept that defendant acted recklessly, merely disregarding the risk as he plunged the knife into Jaquinton again and again, would be gravely insulting and misguided. The wounds that defendant inflicted with his vicious attack that led to Jaquinton's death were not a byproduct of a risk that defendant disregarded. They were the exact result that he embraced and that he desired to bring about.

¶ 57 Accordingly, we decline to reduce defendant's first degree murder conviction to involuntary manslaughter.

¶ 58 B. Ineffective Assistance of Trial Counsel

¶ 59 Defendant alternatively argues that he is entitled to a new trial because trial counsel was ineffective for failing to call Lemario to corroborate defendant's claim that he acted in self-defense. We disagree.

¶ 60 The United States and Illinois Constitutions guarantee every criminal defendant the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To sustain a claim of ineffective assistance, one must show both that defense counsel's performance was deficient, measuring it against an objective standard of competence under prevailing professional norms, and that but for counsel's deficient performance, there was a reasonable probability that the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. at 694. The benchmark for judging any claim

of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id*. at 686.

¶ 61 However, judicial scrutiny of counsel's performance must be highly deferential. *Id*. We should indulge the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional conduct, and defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *Id*. at 689.

¶ 62 It is well-settled that the decision to call a particular witness is a strategic choice that is generally not vulnerable to an ineffective assistance of counsel claim. *People v. Flores*, 128 Ill. 2d 66, 85-86 (1989). However, trial counsel may be deemed ineffective for the failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense. *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999). The trial court's ruling on a motion for new trial will not be reversed absent an abuse of discretion. *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 54.

¶ 63 The issue with defendant's argument is that, first, defendant's claims were not entirely uncorroborated by other witnesses, and Lemario's testimony would not have changed what was clearly visible on the video. But second, Lemario's proposed testimony was inconsistent with other parts of defendant's defense.

¶ 64 Defendant claims that Lemario would have testified that the victims threatened defendant. But Deangelo, along with defendant, testified that threats were made to defendant, and although the video is silent, it is not difficult to believe that threats were hurled amidst the obvious shouting and aggressive posturing of the victims. Lemario's testimony on this point may have added one

more voice to those claiming defendant was threatened, but defendant's own testimony on this point was certainly not uncorroborated at trial.

¶ 65    Likewise, defendant argues that Lemario would have testified that the victims tried to "force their way up." No testimony was needed on this point. The video shows this plainly. All three victims advanced up the stairs while defendant and the men with him consistently retreated until they reached Deangelo's apartment and eventually went inside. At one point in the video, Lavell and Jaquinton are standing at the threshold of Deangelo's door and their arms briefly cross the threshold of Deangelo's apartment.

¶ 66    The problem with all of this, as we have noted, is not whether there was evidence of the victims behaving aggressively. The crux of this case is what happened after the quarrel terminated and the victims turned to leave. That was when defendant struck. Lemario's proposed testimony on these two points would not have changed the critical fact that defendant attacked first after the encounter had ended and the victims were walking away. On this point, we do not find that trial counsel's performance was deficient or that the decision not to call Lemario carried with it the requisite prejudice.

¶ 67    Defendant additionally claims that Lemario would have testified that defendant did not respond to any of the victims "until the guys kicked in his door." It is obvious why trial counsel would have thought this testimony was not only unhelpful, but harmful to defendant's defense. One of defendant's other witnesses in his case-in-chief, Shanara, testified that she was the one who was kicking defendant's door. Calling Lemario to testify as such would have given trial counsel the impossible task of reconciling two contradictory witnesses. Moreover, given that defendant testified that the pounding on his door prompted him to charge down the stairs, and the video

shows all three victims still on the stairs when defendant exits Deangelo's apartment, Lemario's testimony that it was the victims kicking defendant's door would have been nonsensical. And as a final note, defendant's testimony established that his door was still closed and locked after the stabbing, so it follows that no one "kicked in" defendant's door as Lemario would have claimed.

¶ 68    In this case, the decision not to call Lemario was a strategic decision intended to avoid further eroding an already unbelievable defense. Trial counsel's decision not to call Lemario was not deficient performance, nor did it result in the requisite prejudice necessary to grant defendant a new trial. The trial court did not abuse its discretion in denying defendant's motion for new trial.

¶ 69                              III. CONCLUSION

¶ 70    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 71    Affirmed.